WADE JACOBS and MARGARET JACOBS, appellees, v. THE
CITY OF CHARITON, STATE TAX COMMISSION and
STATE OF IOWA, appellants.

No. 48430.

(Reported in 65 N.W.2d 561)

JULY 26, 1954.

REHEARING DENIED OCTOBER 22, 1954.

Leo A. Hoegh, Attorney General, Henry W. Wormley, Special Assistant Attorney General for the State Tax Commission,

Kent Emery, Assistant Attorney General, and Oscar A. Stafford, of Chariton, County Attorney, for appellants.

Killmar & Reynoldson, of Osceola, for appellees.

GARFIELD, C. J.—In February 1952, plaintiff Wade Jacobs operated a beer tavern and pool hall in Chariton. In May 1952, after a full hearing before defendant city council pursuant to section 6, chapter 64, Acts 54th General Assembly (section 99A.6, Code, 1954), the council voted unanimously to revoke the licenses under which Jacobs' business was operated. Defendant State Tax Commission also revoked his sales tax permit. These orders were apparently based on a finding that Jacobs intentionally possessed or willfully kept a gambling device as defined by section 1, chapter 64 (section 99A.1, Code, 1954). The device in question is a pool table in Jacobs' place of business.

Upon review by certiorari of these revocations the district court held the council and tax commission acted illegally on the ground there was no evidence before them that Jacobs intentionally possessed or willfully kept any gambling device upon his premises. We think there was substantial evidence before the council and commission to support their order, they were therefore not illegal, and that the trial court failed to apply chapter 64 as enacted.

Chapter 64, Acts 54th General Assembly (chapter 99A, Code, 1954), so far as now material, provides:

"Section 1. For the purpose of this act, the words, terms, and phrases defined in this section shall have the meanings given them.

"1. 'Gambling devices' means roulette wheels, klondike tables, poker tables, punch boards, faro layouts, keno layouts, slot machines, any ticket, sheet, or writing of any kind used or designed to be used for gambling purposes, and all machines and devices used for gambling or with an element of chance attending operation, and all machines and devices of any nature whatsoever adapted, devised and designed for the purpose of gambling. Nothing in this definition shall be construed to include ordinary playing cards. * * *."

Defendants contend the pool table in question is a gambling device within the meaning of this language in section 1: "all machines and devices used for gambling."

At the hearing before defendant city council it was shown that plaintiffs, Jacobs and wife, owned in joint tenancy a building in the business district of Chariton. Jacobs operated his beer tavern and pool hall on the first floor. The licenses in question were issued to him. Plaintiffs lived in the second story. About 3 a. m. on February 1, 1952, plaintiff Wade Jacobs and John and Tom Pardock met near the entrance to Jacobs' place. Tom there won $30 or $40 from Jacobs shooting craps. On Jacobs' suggestion they then went to his place where he and John Pardock played three games of pool on a "snooker" pool table between 4 and 7 a. m., the exact time being in dispute. The three men were at least partly intoxicated.

Jacobs said at the hearing that $40, $60 and $80 respectively were bet on the three games. There is some dispute as to the exact amounts and as to how much, if any, money changed hands. Significantly, Pardock won the first game on which $40 was bet. Jacobs won the second game and had the third "in the bag" when a brawl ensued and the Pardocks departed.

This is some of Jacobs' evidence before the council:

"Q. Mr. Stafford [city attorney]: Since you have held these licenses have you played for money with anyone besides the Pardock boys? A. No sir. *I might have played for a bottle of beer*, or something like that. No money involved. Q. Anyone else played in there for money? A. Unbeknownst to me if they did. *I suppose they did probably.* I don't know that, but *that's the general consideration in any pool hall in the country. They might play for a quarter on the side* or something like that."

Jacobs also testified that before he went in business for himself he had played Pardock "in every pool hall in town for money." It is quite apparent from the testimony that Jacobs has been for some time a professional gambler to whom playing pool for stakes is not a novelty.

It was further shown to defendant council that Jacobs was indicted on February 16, 1952, for the offense of keeping a gambling house for that "on or about February 1, 1952, he kept a

tavern resorted to for the purpose of gambling, contrary to section 726.1, Code, 1950." The indictment was an outgrowth of Jacobs' playing pool for wagers with Pardock. On March 31, 1952, after consulting his then attorney, Jacobs pleaded guilty in district court to keeping a gambling house, was fined and paid his fine.

-I. We consider first defendants' appeal from the judgment sustaining the writ of certiorari on the ground there was no evidence before the council to warrant revocation of the licenses.

The statutory definition of gambling devices, quoted above, includes: (1) roulette wheels, klondike and poker tables, punchboards, faro and keno layouts and slot machines (2) any ticket, sheet or writing used or designed to be used for gambling (3) all machines and devices used for gambling or with an element of chance attending operation, and (4) all machines and devices adapted, devised and designed for gambling.

It may be conceded pool tables are not included within any of these classes except the third and they are not within that class unless they are used for gambling. However, where, as here, the licensee uses, or knowingly permits to be used, a pool table for gambling we think it falls within the third of these classes. It is then a device used for gambling. The intentional possession or willful keeping of such an article so used upon any licensed premises is cause for the revocation, under section 2 of the Act, of any license upon the premises.

It has been suggested by one of our associates that the words in section 1, chapter 64, "devices used for gambling" mean "devices habitually or customarily used for gambling." This suggested ground for affirmance was never presented to the city council, or to the trial court or this court by plaintiffs' able and experienced counsel whose brief and argument is fifty-four pages long. Further, the theory the minority has advanced to support an affirmance has been repeatedly rejected in gambling and other criminal cases before this court throughout its existence.

In State v. Crogan (Wright, C. J.), 8 (Clarke) Iowa 523, 524, defendant was indicted for keeping a building resorted to for the purpose of gambling contrary to section 2721, Code, 1851, now section 726.1, Code, 1950. We held: "The offense is as

complete if the house is kept for one day, as if kept for a year. * * * To show that the place kept is a gambling house, within the meaning of the statute (section 2721), it may be shown that it was thus used continuously, but it is not necessary to charge such use."

In State v. Cooster (Lowe, C.J.), 10 Iowa 453, 455, the jury was instructed: " 'That in order to convict the defendant of keeping a gambling house, it is not necessary to show that the house was habitually used for that purpose, or a series of acts of the kind, and that a single act of the kind shown to be done with his permission, was sufficient to find the defendant guilty, * * *.' " We said at page 457: "The language of the Code is not, that the *place* should be habitually or generally resorted to, but it is, '*if any person keep a place resorted to for the purpose of gambling,* or permits anyone to play', &c., &c. We suppose that it is the setting apart and keeping a place for the purpose of a resort in this vice, which is consummated as well by a single as by a dozen acts, that constituted the gist of the offense, and not a series of acts or a given number of violations of the law in the premises. If this interpretation of the law be correct, of which we have but little doubt, then the other instruction, also made the ground of error, was properly refused. It is as follows: 'That in order to convict the defendant of the offense of keeping a gambling house you must be satisfied that it was *generally* resorted to for that purpose, that defendant knew it was resorted to and used, and that it was carried on with his knowledge.'

"It will be observed that the language of this instruction is very broad—that no offense can be committed under the law in question until the community *generally* shall visit the establishment of the accused for the purpose of indulging in the prohibited vice. We take quite a different view of the law. We must affirm, * * *."

In State v. Pierce, 65 Iowa 85, 87, 88, 21 N.W. 195, 196, defendant was indicted for nuisance in that he kept a house where drunkenness and other breaches of the peace were carried on and permitted to be carried on. The opinion states: "His [defendant's] position is that to render the place a nuisance * * * there must be a recurrence at the place of the acts enumerated in the section, or some of them, in order to make it a

nuisance, and that it would not be given that character by a single transaction; but that, under the instructions, defendant might be convicted on proof that he permitted said acts to be done at his place on a single occasion. We think, however, that this position is not correct. * * *

"Another position urged by counsel is * * * that the indictment charges that defendant permitted drunkenness, etc., to occur at his place on more than one occasion, whereas, under the instructions, he may be convicted on proof that he permitted it but once. But if the offense may be committed by permitting the occurrence of the acts on one occasion, we know of no reason why he should not be convicted on proof of a single transaction * * *."

In State v. Reyelts, 74 Iowa 499, 501, 38 N.W. 377, 378, defendant was indicted and convicted for maintaining a nuisance by keeping a saloon for the unlawful sale of liquors. We held: "The district court rightly directed the jury that a single sale would warrant a conviction for the nuisance. The keeping of intoxicating liquors, with the intent to sell them contrary to law, is the act of defendant creating the nuisance. One sale will disclose the unlawful intent as well as the keeping. Hence upon one unlawful sale a conviction may be had for nuisance. This we understand is the recognized rule in this state."

Shideler v. Tribe of the Sioux, 158 Iowa 417, 421, 139 N.W. 897, 899, was an action to enjoin the alleged violation of section 2404, Code, 1897, which provided: "Every person who shall * * * keep or maintain * * * any * * * place in which intoxicating liquors are received or kept for the purpose of use * * * or sale * * * shall be punished * * *." The opinion says (at page 423 of 158 Iowa): "The defendant association and its managing officers received and kept this beer for the time being. It is not necessary that there should be any permanent keeping. It has been held under another statute, where the language is similar, 'if a person keep a house resorted to for the purpose of gambling,' that one act of gambling will complete the offense; and that it is as complete, if the house is kept for one day, as if kept for a year. State v. Crogan, 8 Iowa 523; State v. Cooster, 10 Iowa 453. And it has been held that proof of one sale of intoxicating

liquor in a building is sufficient to constitute a nuisance. State v. Reyelts, 74 Iowa 499."

Substantially the language just quoted is repeated in State v. Hunter, 173 Iowa 638, 640, 155 N.W. 961, a prosecution for keeping a disorderly house in violation of a city ordinance.

In State v. Gardner, 174 Iowa 748, 768, 156 N.W. 747, 755, L. R. A. 1916D 767, Ann. Cas. 1917D 239, defendant was charged with resorting to a house of ill fame for the purpose of prostitution and lewdness. We said: "Complaint is made of refusal of an instruction in effect that there could be no conviction unless it was found that defendant frequently resorted to the house of the Lawrences for the purpose charged in the indictment, and that one or an occasional visit to an alleged house of ill fame for such purpose will not warrant a conviction. * * * We are, however, disinclined to affirm such a rule."

State v. Alexander, Iowa, 169 N.W. 657, 658, was a prosecution for keeping a gambling house in violation of what is now section 726.1, Code, 1950. The opinion states: "It is true that the offense of keeping a gambling house is not necessarily a continuing one. The offense may be complete, even though it be. shown that the place kept or resorted to for the purpose of gambling is so kept and maintained, but for a single day or for any definite, measurable length of time. See State v. Crogan, 8 Iowa 523; Shideler v. Tribe of the Sioux, 158 Iowa 417, 139 N.W. 897; State v. Hunter, 173 Iowa, at page 640, 155 N.W. 961. It may, however, be continuous."

Section 726.5, Code, 1950 (section 13210, Code, 1939), says: "No one shall * * * have, keep, or hold in possession or control any roulette wheel * * * *or any other machines used for gambling* * * *." (Italics added.) This statute has been before us several times. We have never given the language italicized by us any such meaning as the minority apparently would give substantially the same language in section 1, chapter 64, Acts 54th General Assembly, now before us. See State v. Cowen, 231 Iowa 1117, 3 N.W.2d 176; State v. Wiley, 232 Iowa 443, 3 N.W.2d 620; State v. Boland, 241 Iowa 770, 41 N.W.2d 727; State v. John Doe, 242 Iowa 458, 46 N.W.2d 541.

State v. Boland (Oliver, J.), supra, affirmed a conviction for illegal possession of gambling devices in violation of section

726.5, Code, 1950, quoted above. None of the articles found in defendant's possession was listed in the statute as a gambling device per se nor was their use by defendant for gambling shown. The opinion says (at page 774 of 241 Iowa, page 730 of 41 N.W.2d): "Defendant contends dice and playing cards are not within the statutory language 'any other machines used for gambling, or any slot machine or device with an element of chance attending such operation.' Section 726.5, Code of 1946. * * *

"The word device refers to the tangible thing with which a game of chance is played as distinguished from the game itself [citation]. We have already pointed out that cards and dice are commonly used in gambling. When so used they are gambling devices [citations]."

Obviously the last sentence in the above quotation means "When cards and dice are used in gambling they are gambling devices." So here, when this pool table was used for gambling it was a gambling device under section 1 of chapter 64, Acts 54th General Assembly.

See also People v. Lippert, 304 Mich. 685, 8 N.W.2d 880, cited with approval in State v. Boland, supra, at pages 773, 774, of 241 Iowa, page 729 of 41 N.W.2d, and State v. John Doe, supra, at page 462 of 242 Iowa, page 543 of 46 N.W.2d.

State v. John Doe, 221 Iowa 1, 3, 263 N.W. 529, was a proceeding to condemn a mint-vending machine under what is now section 726.4. We held: "Whether or not these machines are per se gambling devices is not very material in the consideration of these cases. The question is, Were these machines used for gambling purposes? * * *.

"Many things or articles may be innocent in themselves, but may fall under the condemnation of the law by reason of the manner of their use. For instance, a deck of cards, in itself, may be wholly innocent, yet it may be used in a certain way so that it is subject to condemnation under the law; and it is on this theory that the court undoubtedly acted in the condemnation of these machines, to wit, that as a matter of fact they were being used in such a way as that it was a violation of the law."

Section 127.2, Code, 1950, commands a peace officer who

discovers that liquor has been or is being illegally transported to arrest the offender and "seize said liquor and the conveyance used to effect said transportation." We have never accorded the word "used" in 127.2 any such meaning as the minority apparently favors giving the word in section 1 of chapter 64. See State v. One Certain Automobile, 237 Iowa 1024, 1030, 23 N.W. 2d 847, 851, and citations.

There is no dissent to any opinion above quoted from and the earlier precedents have been uniformly followed in later decisions.

The view of the minority that the words in section 1 of the Act in question "used for gambling" mean "customarily used for gambling" seems to be based in part upon certain language in State v. Gastonguay, 118 Maine 31, 105 A. 402. This was a prosecution for liquor nuisance. No question of gambling was involved. Insofar as it may contain language furnishing some support for the theory the minority suggests it is contrary to the Iowa decisions above-cited, notably State v. Pierce, 65 Iowa 85, 21 N.W. 195; State v. Reyelts, 74 Iowa 499, 38 N.W. 377; Shideler v. Tribe of the Sioux, 158 Iowa 417, 139 N.W. 897. Further, the Maine case states (at page 34 of 118 Maine, page 404 of 105 A.): "Nothing that we have said relates to the quantum of evidence necessary to prove a nuisance. From the circumstances of a single act of keeping or selling, a jury may be justified in finding a custom or habit of keeping or selling."

Several outside decisions similar to the Iowa cases cited above are also opposed to State v. Gastonguay, supra, 118 Maine 31, 105 A. 402. For example, Henry v. State, 77 Ark. 453, 454, 92 S. W. 405, says: "* * * The second instruction asked by appellant was erroneous in that it told the jury that 'the word "used" in the statute has reference to the habitual or permanent use of the house for a purpose and that this purpose must be in the utilization of the said house for the purpose of the illegal sale of whisky.' This is not the law. Under the statute, the use or control of the house need not be 'habitual or permanent.' It is sufficient to convict, if the proof shows that it was used or controlled by the defendant at the time of the illegal sale of liquor therein."

In State v. Tolisano, 136 Conn. 210, 215, 70 A.2d 118, 120, 13 A. L. R.2d 1405, 1409, a telephone was held to be an apparatus and device for the purpose of gaming. The court says: "Articles which ordinarily serve other purposes may be found to be devices and apparatus for gaming purposes if they are reasonably adapted to, and *at the time in question are* intended and *actually used for,* those purposes [citations]." (Italics added.)

Knight v. State, 94 Fla. 868, 114 So. 665, 666, says: "Charlie Knight was indicted, tried and convicted for keeping and maintaining a gambling room for the purpose of gaming and gambling. * * *

"A reversal of the judgment is sought upon the grounds that the evidence, which consisted of the events which transpired on a certain night at the house kept by Knight, was not sufficient to convict him of the offense charged, because the element of frequency or repetition of such events transpiring in that house was lacking. * * *

"The point is not well taken. The judgment should be affirmed."

A Georgia statute authorized the seizure and condemnation of "all vehicles * * * used * * * in conveying any liquors * * *." In Tutton v. State, 28 Ga. App. 152, 154, 110 S. E. 455, 456, there is no suggestion that a vehicle must be habitually so used to justify seizure. The opinion states: "The word 'used' is an active, transitive verb and involves in its definition some action or purpose on the part of the person using the vehicle."

In State v. Shotts, 143 Mo. App. 346, 347, 128 S. W. 245, defendant was prosecuted under a statute which said, " 'Every person who shall keep or permit to be kept or used, any * * * tables mentioned in section 432, without having a license therefor shall forfeit' " etc. The opinion does not suggest the table must be habitually used to be a violation of the statute. At page 349 of 143 Mo. App., page 246 of 128 S. W., the court says, "And it is held that *betting on a game of pool played upon a billiard table constitutes such table a gambling device.* State v. Jackson, 39 Mo. 420; * * *." (Italics added.)

State v. Cuthrell (1952), 235 N. C. 173, 175, 69 S.E.2d 233, 234, 235, was a prosecution under a statute making it a felony to cause to be burned "any building * * * used in carrying on

any trade." The opinion states: "The verb 'used', when referring to a place or thing, has two meanings recognized by all lexicographers and usually differentiated in common speech: (1) In one sense the word means to be the subject of customary occupation, practice, or employment. * * * (2) In another sense the word means to employ for a purpose, to put to its intended purpose, application to an end, the act of using. 43 Words and Phrases, Perm. Ed., page 48 et seq. In this sense a single isolated instance may be sufficient to fulfill the meaning of the word [citations]. We think it is in this latter sense that the word 'used' was intended to be employed in the statute at hand."

In State v. Hauge, 62 N. D. 161, 163, 242 N.W. 402, 403, it was charged defendant kept and maintained a house wherein he did keep, possess, sell and furnish liquor. This instruction to the jury was assigned as error: " 'A person who keeps and maintains a place where intoxicating liquors are sold as a beverage becomes guilty of keeping and maintaining such place when the first sale is made and the place thereby utilized for the prohibited purpose.' The defendant had duly requested the court to charge that a single sale or possession may not be a violation of the nuisance statute * * *; and that the maintenance of a common nuisance implies continuity over a substantial period of time." In affirming the conviction the court quotes this from Scott v. State, 37 N. D. 90, 94, 163 N.W. 813, 814, L. R. A. 1917F 1107 (page 165 of 62 N. D., page 404 of 242 N.W.) : " 'It is not essential that the place shall be kept and maintained for any particular or designated length of time, or that any particular number of prohibited acts take place. A person who keeps and maintains a place where intoxicating liquors are sold, as a beverage, becomes guilty of keeping and maintaining such place when the first sale is made, and the place thereby utilized for the prohibited purpose. The authorities seem to be in accord on the proposition that a single sale is evidence of keeping and maintaining a common nuisance within the purview of the statute. State v. Reyelts, 74 Iowa 499, 38 N.W. 377; State v. Benson, 154 Iowa 313, 134 N.W. 851; * * * Shideler v. Tribe of Sioux, 158 Iowa 417, 139 N.W. 897, 900. See also * * * State v. Cooster, 10 Iowa 453, 457.' "

See also State v. Appley, 207 S. C. 284, 35 S.E.2d 835, 162 A. L. R. 1184.

There was no occasion for defendants to claim the pool table in question was "used for gambling" except for the three games plaintiff Jacobs played with Pardock, because plaintiffs, their counsel or the trial court never contended the words of section 1, chapter 64, "devices used for gambling" mean devices habitually so used. We think, however, the city council could properly have found from the testimony before it to which we have already referred this was not an isolated instance of Jacobs' use of the table for gambling.

■ To constitute gambling of course it is not necessary the stakes be so high as the $40, $60 and $80 per game Jacobs told the council were bet on his three games with Pardock. It is well settled that playing pool "for a bottle of beer or something like that" or "for a quarter on the side" (to use Jacobs' language before the council) is gambling. The amount of the bet is immaterial. State v. Maurer, 7 (Clarke) Iowa 406, 408; State v. Leicht, 17 Iowa 28, 30 (also holding that to constitute gambling the money or "other thing" need not be "put up"); State v. Bishel, 39 Iowa 42; 38 C. J. S., Gaming, section 88b (1) and (3).

■ We are committed to the rule, which accords with the weight of authority, that an understanding the loser is to pay for the use of the table makes the playing of pool or billiards gambling. See State v. Book, 41 Iowa 550, 20 Am. Rep. 609 (the money need not be "put up"); State v. Miller and Kremling, 53 Iowa 154, 4 N.W. 900; State v. Sanders, 86 Ark. 353, 111 S. W. 454, 19 L. R. A., N. S., 913 (holding that a pool table the owner knows is used for gambling is a gambling device), and Note; 24 Am. Jur., Gaming and Prize Contests, sections 34, 39; 38 C. J. S., Gaming, section 88b(3).

■ II. Section 6 of chapter 64 provides: "If, upon the hearing of the order to show cause, the issuing authority finds that the licensee intentionally possessed or willfully kept upon his licensed premises any gambling device, than the license or licenses under which the licensed business is operated, or used in the operation of such business on the licensed premises, shall be revoked."

Plaintiffs complain there was no such finding by defendant

council as this provision contemplates. It is true there was no such express finding by the council upon or after the hearing on the order to show cause why Jacobs' licenses should not be revoked. However, we think it fairly appears the council made such a finding. In any event there was no excess of jurisdiction or other illegality, by reason of this complaint, as entitles plaintiffs to relief in certiorari. (See rule 306, Rules of Civil Procedure.)

On April 25, 1952, the sheriff and chief of police, pursuant to section 4, chapter 64, made written report to defendant council of Jacobs' playing pool with Pardock for money and of his plea of guilty to keeping a gambling house. The council then adopted a written resolution fixing time and place for Jacobs to appear and show cause why licenses issued to him should not be revoked "because of willful keeping or intentional possession of gambling devices on licensed premises contrary to chapter 64, Acts 54th G. A."

Written notice of the resolution with copy thereof and of the report of the peace officers attached was served on Jacobs and he appeared. Purpose of the hearing was fully explained to him and he was asked to show why the licenses issued to him should not be revoked because of the matters set forth in the report of the peace officers. At the conclusion of the hearing the council voted unanimously to revoke all licenses issued to Jacobs by the city. It is apparent this action was taken because the council was of the opinion Jacobs had intentionally possessed or willfully kept a gambling device upon the licensed premises.

Applicable here is this language from Massey v. City Council of Des Moines, 239 Iowa 527, 535, 31 N.W.2d 875, 880: "Certiorari does not lie to review mere irregularities or technical lack of compliance with law. Jenney v. Civil Service Comm., 200 Iowa 1042, 1046, 205 N.W. 958. It is not granted on account of formal or insubstantial errors nor unless manifest injustice has been done [citations]."

III. At the outset of their brief plaintiffs say one of the issues is that chapter 64, so far as it applies to the retail sales permit, violates the State and Federal Constitutions.

Plaintiffs' petition in certiorari alleges "chapter 64 violates the Fifth Amendment U. S. Constitution and Article I, section

1, Iowa Constitution, and confers no authority upon the issuing authorities to perform the acts they are attempting in the instant case." An amendment to their petition states chapter 64 "further violates the constitutional rights of Wade Jacobs to engage in any kind of retail merchandising or sale of amusement admissions or recreational games, insofar as it attempts to provide a revocation of his retail sales permit. That such permit was not issued to him under the state's police power but is an incident to a tax equalization act of Iowa for the primary purpose of raising revenue."

The above allegation of the petition is insufficient because it does not point out the manner or respect in which chapter 64 violates the two constitutional provisions invoked. See Doyle v. Kahl, 242 Iowa 153, 156, 46 N.W.2d 52, 54; Dickinson v. Porter, 240 Iowa 393, 399, 35 N.W.2d 66, 71, appeal dismissed 338 U. S. 843, 70 S. Ct. 88, 94 L. Ed. 515, and citations; Martin Bros. Box Co. v. Fritz, 228 Iowa 482, 492, 292 N.W. 143. The amendment to the petition does not point out specifically that any sections of the Federal or State Constitution, except those referred to in the petition, are violated. See Peverill v. Board of Supervisors, 201 Iowa 1050, 1056, 205 N.W. 543, and authorities last above.

In any event, plaintiffs' claim that chapter 64 violates the Fifth Amendment to the Federal Constitution is clearly without merit since this provision is a restriction only on the Federal Government, not upon the states. Olander v. Hollowell, 193 Iowa 979, 983, 188 N.W. 667 (error dismissed 262 U. S. 731, 43 S. Ct. 699, 67 L. Ed. 1205); State v. Manley, 197 Iowa 46, 52, 196 N.W. 724; State v. Burch, 199 Iowa 221, 227, 200 N.W. 442; 16 C. J. S., Constitutional Law, section 568b(1), page 1146; 12 Am. Jur., Constitutional Law, section 567. See also State v. Berg, 237 Iowa 356, 360, 21 N.W.2d 777, 779.

The other constitutional provision plaintiffs allege chapter 64 violates (Article I, section 1, Iowa Constitution) is, "All men are, by nature, free and equal, and have certain inalienable rights—among which are those of enjoying and defending life and liberty, acquiring, possessing and protecting property, and pursuing and obtaining safety and happiness."

In argument here plaintiffs' main claim of unconstitu-

1394

tionality of the provision of chapter 64 authorizing revocation of the retail sales permit is that it violates due process provisions, section 1, Amendment 14, United States Constitution, and Article I, section 9, Iowa Constitution. Of course these are restrictions upon the power of the state. However, this is a clear attempt by plaintiffs to mend their hold in this court. We have repeatedly held constitutional questions cannot be raised for the first time here. See In re Guardianship of Brice, 233 Iowa 183, 186, 8 N.W.2d 576, 578; Witmer v. Peebles, 229 Iowa 404, 406, 294 N.W. 563 (where the constitutional question was raised by appellee); Martin Bros. Box Co. v. Fritz, supra, 228 Iowa 482, 492, 292 N.W. 143, and citations. See also 16 C. J. S., Constitutional Law, section 96b, page 224; 11 Am. Jur., Constitutional Law, section 125; Rubin Brothers Butter & Egg Co., Inc., v. Larson, 245 Iowa 741, 746, 63 N.W.2d 908, 911, and citations.

Plaintiffs have not convinced us the provision of chapter 64 authorizing revocation of Jacobs' retail sales permit violates Article I, section 1, Iowa Constitution. We are cited to no authority that would support such a holding. There is very little argument upon the precise point. No sound reason is advanced why this constitutional provision is violated by this part of the law. We are not required to search for such reasons. That the statute may be severe or drastic does not render it unconstitutional in the respect claimed. See City of Des Moines v. Manhattan Oil Co., 193 Iowa 1096, 1110, 1111, 184 N.W. 823, 188 N.W. 921, 23 A. L. R. 1322; Lee v. Hoffman, 182 Iowa 1216, 1218, 166 N.W. 565, L. R. A. 1918C 933; Northwestern Laundry v. City of Des Moines, 239 U. S. 486, 492, 36 S. Ct. 206, 208, 60 L. Ed. 396, 401, and citations; 16 C. J. S., Constitutional Law, section 175a, page 540, section 209a, page 611.

It may be conceded a retail sales permit differs materially from licenses to sell beer and cigarettes and to operate a pool hall. Perhaps the latter involve an exercise of the police power and the former is an incident of the power of taxation. The point need not be decided. If it be so conceded, unconstitutionality of this part of the Act in the respect claimed does not necessarily follow.

Chapter 64 is not vulnerable to the constitutional attack made upon it if it can be said to be a reasonable exercise of the state's police power. Benschoter v. Hakes, 232 Iowa 1354, 1361, 8 N.W.2d 481, 485, and citations; 16 C. J. S., Constitutional Law, section 198, page 574. We are not prepared to hold it is not a valid police regulation. The aim or purpose of the Act seems to be to abolish gambling in any place of business for which a license is issued. The legislature apparently deemed it an efficient measure to accomplish that purpose. That such a subject is a proper one for the exercise of the police power is plain. (Incidentally, the law passed the legislature with only two negative votes in each house.)

Plaintiffs do not argue that chapter 64 does not authorize the revocation of Jacobs' retail sales permit.

IV. There remains the cross-appeal of plaintiff Margaret Jacobs. The trial court annulled the revocation of Jacobs' licenses and deemed it unnecessary to determine what Mrs. Jacobs' rights would be if such revocation were sustained. As previously stated, Jacobs and wife owned the building in question as joint tenants and such ownership was shown by the records of the county recorder. Just before trial of the certiorari action Jacobs conveyed his interest to his wife. A copy of the order of defendant council to show cause was not mailed to Mrs. Jacobs. Section 5 of chapter 64 provides, "A copy of the order shall forthwith be mailed to the owner of the premises, as shown by the records * * * of the County Recorder * * *."

Section 6 of the Act states: "No new license or licenses shall be granted the licensee, nor for the same business if it is established that the owner had actual knowledge of the existence of the gambling devices resulting in the license revocation, upon the same premises, for the period of one year following the date of revocation."

Section 9 provides: "When the license is revoked under the provisions of this Act, subject to the provisions of section 6, the owner of the premises upon which any licensed business has been operated shall not be penalized by reason thereof unless it is established that he had knowledge of the existence of the gambling devices resulting in the license revocation."

Mrs. Jacobs contends, we think correctly, it was not established she had actual knowledge any of her husband's pool tables was used for gambling. Apparently no effort was made to establish this. From this she argues defendants have no right, by reason of the revocation of Jacobs' licenses, to refuse licenses to a bona fide occupant of the building other than her husband for one year following the effective date of the revocation, that the prohibition in the last paragraph of section 6 against the issuance of new licenses for the same business to one other than Jacobs is not applicable because it was not established she knew the pool table was used for gambling. Mrs. Jacobs also relies on section 9 quoted above.

Defendants' only contention upon Mrs. Jacobs' appeal is that she attempted by amendment to plaintiffs' petition to join an action for declaratory judgment with one in certiorari which, they say, may not be done. We find it unnecessary to decide this point. Section 6 of the law provides "a licensee whose license has been revoked or any owner of licensed premises aggrieved by an order of an issuing authority, may" apply for a writ of certiorari. We think this authorized Mrs. Jacobs to commence this action in certiorari to review the revocation of these licenses and the effect thereof as to her. It was unnecessary for her to amend plaintiffs' petition to ask a declaratory judgment for this purpose and the prayer therefor may be disregarded.

If Mrs. Jacobs were sole owner, rather than joint tenant, of the building, there can be little doubt she should not be penalized by revocation of the licenses since her knowledge the pool table was used for gambling was not established. We think she should not be so penalized even though she was merely a joint tenant. There are two principal considerations that lead us to this conclusion.

First, a singular word such as "owner" in a statute is frequently held to mean "owners." Code section 4.1 provides that "unless such construction would be inconsistent with the manifest intent of the general assembly, or repugnant to the context of the statute: * * * 3. * * * Words importing the singular number may be extended to several persons * * *." See Sexton v. Lauman, 244 Iowa 570, 574, 57 N.W.2d 200, 202 ("While the word 'owner' is singular in the statute it may extend

to the plural 'owners' * * *."); Zilske v. Albers, 238 Iowa 1050, 1059, 29 N.W.2d 189, 194, and citations; 82 C. J. S., Statutes, section 337.

The second consideration is the nature of the interest of joint tenants. We have said they "are regarded as one individual" and "each joint tenant is regarded as having the whole of the estate * * *." Fleming v. Fleming, 194 Iowa 71, 81, 82, 174 N.W. 946, 950, 180 N.W. 206, 184 N.W. 296 (error dismissed 264 U. S. 29, 44 S. Ct. 246, 68 L. Ed. 547). See also 48 C. J. S., Joint Tenancy, section 6; 14 Am. Jur., Cotenancy, section 8.

48 C. J. S., Joint Tenancy, section 14, states, "* * * the mere relationship of joint tenants does not authorize one to act as agent for the other. As a general rule, an act or contract by one joint tenant respecting the joint property without the authority or consent of his cotenants cannot bind or prejudicially affect the latter." See also Anderson v. Sutton, 301 Mo. 50, 58, 254 S. W. 854, 856.

The trial court was in error in annulling the revocation of licenses to Wade Jacobs. Such revocation should have been sustained. However, since it was not established Mrs. Jacobs had knowledge the pool table was used for gambling she should not be penalized by reason of such revocation. (See last paragraph of section 6, and section 9, chapter 64.) The effect of this is a reversal upon defendants' appeal and the cross-appeal of Mrs. Jacobs. Costs in this court and the trial court should be taxed two thirds to Wade Jacobs, one third to defendants.

Plaintiffs' motion to dismiss defendants' appeal or affirm the judgment, ordered submitted with the appeal, is overruled.

For judgment in harmony herewith the cause is, upon both appeals—Reversed and remanded.

WENNERSTRUM, THOMPSON and LARSON, JJ., concur.

OLIVER, J., concurs in all but Division III and concurs specially in Division III on the ground the constitutional questions therein considered were not properly raised.

HAYS, MULRONEY, BLISS and SMITH, JJ., dissent.

1398

Hays, J. (dissenting)—I cannot agree with the majority opinion and respectfully dissent.

The sole question involved here is the meaning to be given to the words "used for gambling" as they appear in section 1(1), chapter 64, Acts 54th General Assembly.

This chapter, enacted in February 1951, is before this court for the first time. Apparently no other jurisdiction has a like statute, at least I have not so found, nor is any cited in the briefs or the majority opinion. No one questions the authority of the legislature to enact such legislation under its broad police powers. However, the statute is one providing for a forfeiture, is drastic in its provisions, and under all rules of construction must be strictly construed. In fact, such statutes should be enforced only when within the letter and spirit of the law. United States v. One 1936 Model Ford, 307 U. S. 219, 59 S. Ct. 861, 83 L. Ed. 1249; State ex rel. Woodbury County Anti-Saloon League v. McGraw, 191 Iowa 1090, 183 N.W. 593; 37 C. J. S., Forfeitures, section 5(a); 23 Am. Jur., Forfeitures and Penalties, section 5.

Courts when called upon to construe a statute must give to it the meaning placed thereon by the enacting authority, even to the extent of reaching an absurd result, when the terms and provisions set forth in the statute are clear and unambiguous. Courts also in construing a statute will, when the terms thereof are indefinite and ambiguous, examine the entire statute, ascertain the object and purpose thereof and give to it a meaning in accord therewith, avoiding ridiculous and absurd results where possible. Schuler v. Holmes, 242 Iowa 1303, 49 N.W.2d 818.

In my opinion this statute is patently ambiguous. As said in Hubbard v. Marsh, 241 Iowa 163, 40 N.W.2d 488, an ambiguity exists when, after the application of pertinent rules of construction to the face of the instrument, a genuine uncertainty results as to which of one or two meanings is the proper one. This is certainly true here in the words "used for gambling." The word "use" is one of the most comprehensive words in our language and may be used in many senses. Buell v. Indian Refining Co., 62 Ohio App. 108, 23 N.E.2d 329. In State v. Gastonguay, 118 Maine 31, 33, 105 A. 402, 403, it is said: "The verb 'use' or 'used' has two meanings recognized by all lexicographers

and unconsciously differentiated in common speech. (1) To employ or be employed or occupied. In this sense the word would include a single isolated instance of use. (2) To practice customarily or (in the case of a place or thing) to be the subject of customary practice, employment or occupation." As said in McJimsey v. City of Des Moines, 231 Iowa 693, 700, 2 N.W.2d 65, the word "use" should be interpreted with some reasonable regard for the connection in which it is employed.

All will concede that the pool table in question was, at the specific time in question, used for gambling purposes, but it does not follow that such use brings the table within the terms of said chapter. The majority opinion views the statute as a prohibition against the act of gambling, as such; accepts the literal meaning of the word "use" to be "to employ or be employed"; and based upon decisions of this court in cases arising under the penal statutes, holds the isolated use of the table to bring it within the terms thereof. In support thereof it cites many cases arising under section 726.1, Code, 1950. Nowhere in this statute is the word "use" or "used" found. In each case there is ample evidence of continued violation of the statute, and, in many, statements to the effect that a single act would sustain a conviction appear to have no connection with the issues presented by the appeal.

The opinion also cites section 726.5, Code, 1950 (a penal statute), which contains words very similar to the ones in question, and states that we have never given these words the meaning the minority apparently would give the same language in chapter 64, citing four cases. I agree that we have never so construed that statute but perhaps it may be because the question has never been before the court. At least the four cases cited are not in point as they all deal with devices having an element of chance involved in their operation.

Getting back to the real question—what is the intended meaning of the words "used for gambling"?

The legislature, in enacting this chapter, adopted four distinct classifications or instrumentalities in defining "gambling devices": (1) Those specifically named, i. e., roulette wheels, etc.; (2) those having an element of chance attending their operation; (3) those adapted, devised and designed for gam-

bling; (4) those used for gambling. While it is true that the ultimate end to be attained is the stamping out of gambling, the statute does not contain any prohibition against it, as such. Section 2 states that the use need not be established in order to revoke the license. Section 1(1) states "nothing in this definition shall be construed to include ordinary playing cards", thus it would seem that one may gamble with such with impunity, so far as this chapter is concerned. Section 4 requires inspection of premises to see if gambling devices are kept, nothing said about use. Section 6 says that if the licensee intentionally possessed or kept any gambling device, the license shall be revoked. It does not even require that the use of the device for gambling purposes be known to the licensee. It merely says a device used for gambling makes it a gambling device subject to the forfeitures in the statute if intentionally kept or possessed. Under a literal construction, a surreptitious use of the pool table by third parties would cause the forfeiture of the license of the party owning the table or who intentionally kept it. This is of course a ridiculous view to take of the statute but that is what it says. Also in the instant case the owner participated in the gambling and I call attention to the above merely to show that the statute is not as clear and distinct in its meaning as the majority opinion might indicate.

In State v. Hundling, 220 Iowa 1369, 1371, 264 N.W. 608, 609, 103 A. L. R. 861, it is said that the evil the state recognizes in a gambling enterprise is that it "arouses the gambling spirit and leads people to hazard their substance on a mere chance." The legislature under classifications (1), (2) and (3), above, has recognized the fact that such devices have but one primary purpose—gambling—and that the purpose in keeping and possessing the same can be for no other purpose than to arouse the gambling spirit of those frequenting his premises, to his own personal gain. To combat this situation chapter 64 was enacted and under it the state is relieved of the strict proof and procedure required under Titles XXXV and XXXVI, Code, 1950. Group (4), above, those used for gambling, is a part of the same statute and must have been included therein for the same reasons and purpose. However, it deals with a device that is legal per se,

the mere possession of which does not arouse the gambling instinct. The legislature wisely required that before such a device becomes illegal and subjects the owner thereof to the forfeiture provisions of the statute by the mere possession thereof, something more than mere possession must appear. There must appear such a use thereof as to bring it within the meaning and purpose of the Act, i. e., some degree of custom or continuity of use for gambling purposes in connection with the premises where it is kept. One isolated use of this pool table, under the circumstances shown here, certainly cannot be such use. To so hold is, in my opinion, ridiculous and absurd. I think the trial court correctly held that the table was not a gambling device within the provisions of said chapter.

Under this view of the chapter and the decision reached, it is not necessary to consider the propositions considered in the other divisions of the majority opinion. I do however agree that the motion to dismiss or affirm the appeal should be denied.

I would affirm the trial court.

BLISS, SMITH and MULRONEY, JJ., join in this dissent.

———

MULRONEY, J. (dissenting)—I join in the dissenting opinion of Justice Hays, but there is a further point in the case about which I would like to comment. The trial court held the defendants' retail sales tax permit should not have been revoked. The majority opinion states the appellees "do not argue that chapter 64 does not authorize the revocation of Jacobs' retail sales permit." It would seem to me the trial court should be upheld if there be any sound reasons for his ruling.

However in the instant case I think appellees' argument, construed perhaps a little leniently, succeeds in conveying the thought that chapter 64, rightly construed, would not authorize the revocation of Jacobs' sales tax permit. Brief points 7 and 8 in appellees' brief are as follows:

"7. The issuance of a Sales Tax Permit is but an incident of the taxation function of government, is not an exercise of the police power and is not intended as a grant or privilege to transact business requiring regulation under the police powers.

"8. To permit revocation of Sales Tax Permit under guise of police power violates Federal and State Constitutions."

In the argument in the brief appellees concede in effect that the beer license, cigarette license, and pool hall license could be revoked under chapter 64 for they are licenses that are granted under the police powers of the state and municipality. But they argue the "Sales Tax Permit which the State Tax Commission sought to revoke is an entirely different matter." Counsel quotes the definition statute (99A.1, paragraph 4, Code, 1954) defining "license" as including all permits "for the carrying on, or used in the carrying on, of any business * * *." He goes on to argue that the "Sales Tax Permit [is] but an incident of the taxation function of our government" and he states: "It is obvious that the Retail Sales Tax Permit was not intended to grant a privilege for the transaction of any business requiring regulation under the Police Powers." He cites the article of Professor Tunks, appearing in 23 I. C. A. at page 103, where the professor stated the sales tax permit was largely for convenience in collection of the tax, and it was not a permit for the privilege of doing business.

Appellees' counsel does not directly raise the constitutional questions but he does argue at several places in his brief that "if chapter 64 was intended to permit revocation of the Iowa Sales Tax Permit" then it would offend against various provisions of the State and Federal Constitutions. This is a familiar argument frequently made in support of a certain interpretation of a statute—one that will uphold its constitutionality. As applied to this case it is easily recognized as an argument that chapter 64 does not grant the power to revoke sales tax permits —otherwise, so appellees contend, it would be unconstitutional.

On the merits of the argument I would hold for appellees. The licenses that can be revoked under the statute are those that are granted under the police power—permits for carrying on a business. The retail sales tax permit is, as appellees argue, not granted under the police powers, and it is not, as Professor Tunks states, a permit for the privilege of doing business.

The Retail Sales Tax Permit statute (section 422.53, Code, 1954) is still a tax revenue measure even though the permit fee is only fifty cents. It is part of a general tax revenue law or the

retail sales tax law. The retailers are made the collectors of that sales tax which is paid by consumers and the purpose of section 422.53 is to authorize the retailers to collect the tax and to make them subject to the tax commission's regulations with respect to such collection and payment to the state.

A much similar license was required under the Arizona gross sales tax act and in Giragi v. Moore, 48 Ariz. 33, 58 P.2d 1249, and 49 Ariz. 74, 80, 64 P.2d 819, 821, 110 A. L. R. 314, 323, the question was whether there was a license or tax involved. In holding the license was in fact a part of the tax law the Supreme Court of Arizona stated:

"No condition except payment of a license fee is attached to the issuance of the license. All persons who pay the fee are entitled to receive a license and for whatever location it may be applied for. The amount of the fee is fixed and unvarying and is paid but once. The $1 is nothing more than a registration tax. It is the means of keeping the Tax Commission informed as to who are taxable and where their places of business are so that the commission may supply them with blank forms, and, too, it keeps those in the business alive to the necessity of keeping books and making monthly reports. It is said that, 'where the fee is exacted solely or primarily for revenue purposes and payment of the fee gives the right to carry on the business or occupation without the performance of any further conditions, it is not a license fee but a tax imposed under the power of taxation, regardless of the name by which it may be called.' 37 C. J. 170, §6. After this $1 license fee or tax is paid, the Tax Commission has no control over the business of the licensee. Its exaction is in no sense regulatory and in the exercise of the police power."

To the same effect see City of Phoenix v. State ex rel. Conway, 53 Ariz. 28, 85 P.2d 56.

I would hold the retail sales tax permit granted to Jacobs was not a license subject to revocation under the provisions of the Act in question.

BLISS, J., joins in this dissent.