Mary E. DIEHL d/b/a The River Queen, Appellant,

v.

IOWA BEER AND LIQUOR CONTROL DEPARTMENT HEARING BOARD, Appellee,

Iowa Department of Public Safety, Intervenor.

No. 87–65.

Supreme Court of Iowa.

April 13, 1988.

Jon M. Kinnamon of Kinnamon, Kinnamon, Russo & Meyer, Cedar Rapids, for appellant.

Thomas J. Miller, Atty. Gen., and Gary L. Hayward, Asst. Atty. Gen., for appellee.

Considered by HARRIS, P.J., and LARSON, SCHULTZ, LAVORATO, and SNELL, JJ.

SNELL, Justice.

On October 30, 1987, a hearing officer for the Iowa Beer & Liquor Control Department determined, following an administrative hearing, that Mary E. Diehl, doing business as The River Queen, had violated various provisions of statutory and administrative law. As a sanction for these alleged violations, the Department suspended Diehl's liquor control license for three weeks. *See* Iowa Code § 123.39 (1985). This suspension was affirmed on administrative appeal and by the district court on Diehl's petition for judicial review. This appeal followed.

### I. *The Search and Seizure Issue.*

■ Diehl contends that certain evidence which was introduced against her at the administrative hearing was obtained in violation of her constitutional rights to be free of unreasonable searches and seizures. From this minor premise, she concludes the evidence should have been excluded from the record. We refrain from addressing the merits of her constitutional argument because we believe her contention's necessary, but unstated, major premise—that the exclusionary sanction applies in cases of this type—is flawed. *See, e.g., In Interest of J.A.N.,* 346 N.W.2d 495, 498 (Iowa 1984) (courts are duty-bound to avoid constitutional issues if case can be disposed of on other grounds); *Salsbury Laboratories v. Iowa Dep't of Envtl. Quality,* 276 N.W. 2d 830, 837 (Iowa 1979) (avoidance of constitution issues except when necessary for proper disposition of case is a bulwark of American jurisprudence).

In *Westendorf v. Iowa Department of Transportation,* 400 N.W.2d 553 (Iowa 1987), we were presented with an administrative revocation of a driver's license. The district court reversed on judicial review, holding that evidence which was used against Westendorf at the administrative hearing had been obtained by an unlawful stop and, consequently, should not be considered. In reversing the district court's judgment, we stated the controlling issue and our resolution of it as follows:

> The district court apparently concluded that the exclusionary rule formulated under the fourth and fourteenth amendments to the United States Constitution extends to the use of evidence in a civil case as well as in criminal proceedings. We refuse to extend that far the reach of that court-made rule.

400 N.W.2d at 556.

We think a similar resolution of the issue is mandated here. As in *Westendorf,* we apply a cost-benefit framework in order to determine the propriety of the exclusionary sanction, balancing the potential benefits of excluding unlawfully seized evidence against the resulting costs to societal interests. 400 N.W.2d at 557; *see also Immigration & Naturalization Serv. v. Lopez-Mendoza,* 468 U.S. 1032, 1041, 104 S.Ct. 3479, 3486, 82 L.Ed.2d 778, 782 (1984); *Kain v. State,* 378 N.W.2d 900, 901–02 (Iowa 1985). As in *Westendorf,* the imposition of an exclusionary sanction in this license suspension proceeding would have little force in deterring unlawful police action, the sanction's purpose. *See Westendorf,* 400 N.W.2d at 557; *see also Elkins v. United States,* 364 U.S. 206, 217, 80 S.Ct. 1437, 1444, 4 L.Ed.2d 1669, 1677 (1960). This is because the suspending authority—here the Iowa Beer & Liquor Control Department—does not control the actions of either local police officers or the department of public safety.

As in *Westendorf,* the potential societal cost accruing from the loss of reliable and relevant proof of licensee misconduct is high. The importance of public regulation of licensee conduct is both statutorily expressed, *see* Iowa Code § 123.1 (1985), and of long-standing notice in the cases, *see, e.g., McLane v. Bonn,* 70 Iowa 752, 756, 30 N.W. 478, 480 (1886). On balance, we think the burdens resulting from the exclusionary sanction's application exceed the potential benefits to such an extent as to make its application in this license suspension proceeding inappropriate and unwise. Because the sanction is unavailable in these

proceedings, we need not determine the legality of the evidence's acquisition.

## II. *The Record Support.*

The Iowa Beer & Liquor Control Department is given the statutory authority to suspend liquor control licenses by Iowa Code section 123.39 (1985), which provides that the "[v]iolation of any of the provisions of this chapter" may be a ground for suspension. In the present proceedings, the department relied on two provisions, which provide in pertinent part as follows:

No person or club holding a liquor control license ... shall ... [s]ell alcoholic beverages or beer to any person on credit, except with a bona fide credit card.

Iowa Code § 123.49(2)(c)(1985).

No person or club holding a liquor control license ... shall ... [k]nowingly permit any gambling ... on the premises covered by the license....

Iowa Code § 123.49(2)(a)(1985).

■ A. *Credit sales.* Diehl contends the credit sales involved were made pursuant to a bona fide credit card system. The record discloses Diehl allowed patrons to purchase food, cigarettes, beer and liquor on credit. Her credit system involved the use of two index cards, both of which were retained by Diehl. One card identified Diehl as the creditor, identified the individual debtor, assigned the debtor a number, was signed by the debtor, and stated the following: "Credit limit set by creditor. Total payment of account due upon demand by creditor." The second card contained the date and amount of each credit sale. Diehl testified the maximum credit allowed was $20.00. She did not charge interest on the outstanding balance; nor was there any system of periodic billing. She stated she instituted the system because her patrons were ineligible for conventional commercial credit cards.

We recognize that due to the complexities of modern transactions, a clear-cut definition of "credit card" is difficult. *See* 50 Am.Jur.2d *Letters of Credit, and Credit Cards* § 38, at 428 (1970). The present case requires that we go one step further and determine whether Diehl's system constitutes a "bona fide credit card" within the ambit of section 123.49(2). We conclude it does not.

It has been suggested that the purpose of legislative restrictions on the credit sale of alcoholic beverages is that of protecting the general public from indiscretionary consumption of liquor. Annotation, *Construction and Effect of Liquor Regulation Forbidding or Restricting Sales on Credit or Other Than for Cash,* 17 A.L.R.3d 396, 399 (1968); 45 Am.Jur.2d *Intoxicating Liquors* § 296, at 690 (1969). As originally introduced into and passed by our senate, the bill in which section 123.49(2) is contained provided for an absolute prohibition of credit sales of alcoholic beverages. *See* S.F. 437, 60 G.A., ch. 114 § 16 (1963). The exception for bona fide credit cards was added by amendment of our house of representatives prior to approval.

In interpreting a statute, we presume its enactment intended a reasonable result and we endeavor to avoid impractical or absurd results. *E.g., Metier v. Cooper Transp. Co.,* 378 N.W.2d 907, 913 (Iowa 1985). The statutory context involved here posits a prohibition on the credit sale of beer and alcoholic beverages and allows for, with respect to retailers such as Diehl, only one exception. Given this restrictive context, we think it unreasonable to conclude that the mere recording of credit sales—which is what we believe Diehl's system amounts to—satisfies the intent of the "bona fide credit card" exception. Were we to hold otherwise, we would reduce the statute to nothing more than a prohibition of unrecorded credit sales.

We recognize that Diehl's system may satisfy the technical requirements of our consumer credit code which defines "credit card" as "a card or device issued under an arrangement pursuant to which a card issuer gives a cardholder the privilege of ... purchasing services ... or otherwise obtaining credit from the card issuer...." Iowa Code § 537.1301(16) (1985); *see also* Iowa Code § 537.1301(15) (1985) (definition of credit). Clearly, however, the legislature did not intend the incorporation of this definition into section 123.49(2)(c)'s prohibi-

tion of credit sales, as this prohibition was enacted some eleven years prior to the consumer credit code. *Compare* 1963 Iowa Acts ch. 114, § 16 *with* 1974 Iowa Acts ch. 1250, § 1.301.

We think that in prohibiting all credit sales except those involving a bona fide credit card, the legislature intended to ban all direct credit running from a retailer to its patrons. This is suggested by the fact the legislature carved out two exceptions to this prohibition which specifically allow limited use of direct credit: "sales by a club to its members ... [and] sales by a hotel or motel to bona fide registered guests." Iowa Code § 123.49(2)(c) (1985). The general rule is that statutory exceptions reflect the legislature's opinion that the excepted matter would have been within the purview of the general provision, absent the exception. *River Bend Farms, Inc. v. M. & P. Missouri River Levee Dist.*, 324 N.W.2d 460, 462 (Iowa 1982).

Given this concern with direct credit, we think the third exception, that allowing for the use of "bona fide credit cards," envisions the use of credit cards involving a third-party guarantor. This statutory section was given this interpretation by an attorney general's opinion filed one year following the statute's enactment. 1963 Op. Iowa Att'y Gen. 267. That opinion concluded "that the ordinary meaning adapted to credit card implies a third party guarantor." *Id.* In reaching this conclusion, the opinion relied upon the following definition of "credit card," taken from *Williams v. United States*, 192 F.Supp. 97, 99–100 (S.D.Cal.1961):

A credit card is nothing more than an indication to sellers of commodities that the person who has received a credit card from the issuer thereof has a satisfactory credit rating and that, if credit is extended, the issuer of the credit card will pay (or see to it that the seller of the commodity receives payment) for the merchandise delivered. A credit card signifies that the legal owner thereof is a good credit risk and the issuer guarantees payment for goods, wares and merchandise sold and delivered on the basis of the card.

We recognize opinions of the attorney general not as controlling authority, but as authority which should be granted weight and respectful consideration. *E.g., Unification Church v. Clay Cent. School Dist.*, 253 N.W.2d 579, 581 (Iowa 1977).

Accordingly, we hold that systems such as that established by Diehl were not within the contemplation of the legislature when it provided the "bona fide credit card" exception to the prohibition of credit sales of beer and alcoholic beverages. The agency and the district court correctly applied the pertinent law and, accordingly, we affirm on this issue.

B. *Gambling device.* The agency also premised its suspension of Diehl's license on a finding that Diehl had knowingly permitted gambling on The River Queen in violation of section 123.49(2)(a). Our statutes contain no definition of "gambling." However, Iowa Code chapter 99A deals with license revocation for possession of gambling devices and incorporates the definition of the phrase "gambling devices" contained in Iowa Code section 725.9. *See* Iowa Code § 99A.1(1) (1985). This latter section defines "gambling device," in pertinent part, as "a device used or adapted or designed to be used for gambling and includes, but is not limited to ... pull-tabs." Iowa Code § 725.9 (1985). The agency's finding on this issue was premised upon Diehl's use of pull-tabs.

At one time, this statutory prohibition provided that the enumerated devices were "gambling devices per se." *E.g.,* Iowa Code § 725.9 (1979). An amendment removed this language. 1980 Iowa Acts ch. 1190, § 1 (codified at Iowa Code § 725.9 (1981)). When a statutory amendment deletes certain words, a change in the law is presumed unless the remaining language amounts to the same thing. *Nelson v. Restaurants of Iowa, Inc.*, 338 N.W.2d 881, 884 (Iowa 1983). We believe the statute, as currently written, prohibits possession of the enumerated items only when they are, in fact, used as "gambling devices."

The predecessor to the current statute prohibited the possession of any machines "used for gambling...." *E.g.*, Iowa Code § 726.5 (1950). This phrase is also contained in the statute under consideration in this case. *See* Iowa Code § 725.9(3) (1985). In determining whether a particular device was used for gambling, we employed the following test: Was the device "adapted and designed to play any game of chance for money or other things of value?" *State v. Doe*, 242 Iowa 458, 463, 46 N.W.2d 541, 544 (1951); *State v. Boland*, 241 Iowa 770, 773, 41 N.W.2d 727, 729 (1950). This interpretation has long been a part of our jurisprudence. *See State v. Maurer*, 7 Iowa 406, 408 (1858) ("[I]t is sufficient [in order to constitute "gambling"], if money, property, or thing of value, was played for by the parties....").

The pull-tabs used by Diehl on The River Queen were given to a customer on ordering a drink. By pulling a tab, the customer learned whether the drink cost full price, half price, or twenty-five cents. To constitute gambling, it is not necessary that the money or "other thing" should be "put up." *State v. Leicht*, 17 Iowa 28, 30 (1864); *see also Jacobs v. City of Chariton*, 245 Iowa 1378, 1391, 65 N.W.2d 561, 568 (1954).

A playing with an agreement or understanding that the losing party shall pay 'for the glasses or drinks round,' the same being called for and drank accordingly on the result being known, is gambling within the meaning of the statute.

*Leicht*, 17 Iowa at 30. The amount of the wager is immaterial. *Jacobs*, 245 Iowa at 1391, 65 N.W.2d at 568. Neither has it been deemed necessary that the potential "winnings" be worth more than that "put up." *See generally State ex rel. Manchester v. Marvin*, 211 Iowa 462, 233 N.W. 486 (1930) (potential winnings consisted only of token which entitled player to humorous advice from machine; "gambling device" within statute). As nothing in the subsequent amendments and revision of the statute suggests legislative dissatisfaction with this interpretation, we employ it again today. *E.g.*, *Beier Glass Co. v. Brundige*,

329 N.W.2d 280, 285–86 (Iowa 1983); *Mallory v. Paradise*, 173 N.W.2d 264, 266 (Iowa 1969); *see Pearson v. Robinson*, 318 N.W.2d 188, 191 (Iowa 1982).

The agency's conclusion was based upon Diehl's possession of pull-tab cards which were used by her patrons to determine drink prices during "happy hours" on The River Queen. These two-by-four-inch cards each contained five spaces covered by tabs. Pulling on one of the tabs disclosed the price which the patron would pay for his or her drink. The most the patron would pay was full price; the least was twenty-five cents.

We think use of the pull-tabs constituted gambling within the statute. When a drink is ordered under this system, the patron risks paying full retail price on the chance of paying less; the vendor risks receiving only twenty-five cents or one-half the retail price of the drink on the chance of receiving full price. The game is played for the difference between those extremes. This difference constitutes the money or other thing of value which, depending on the prevailing fortunes, will be awarded to either the vendor or the patron. The patron wins by receiving a discounted drink—in essence getting something for nothing—and loses by paying full price; the vendor wins by receiving full retail price for the drink and loses by receiving less than retail.

Analogous cases have long noted the "[g]reat ingenuity [which] has been utilized by the inventors of these machines to so construct them that they will not be gambling devices in the eyes of the law." *State v. Doe*, 221 Iowa 1, 2, 263 N.W. 529, 529 (1935). Of course, the distance from the inner to the outer side of the prohibitive line is not great. But, no inventor has yet been able to contrive a nongambling device which functions nevertheless as a gambling device. *See State ex. rel Manchester*, 211 Iowa at 465, 233 N.W. at 487. The courts, generally, look behind the name and style of the device and examine the substance of the game, under whatever guise it is conducted. *Doe*, 242 Iowa at 463, 46 N.W.2d at 544. Although ingenuity

is also present in the case at bar, it is not, we think, successful in obtaining its goal. The decision of the agency and the district court is fully consonant with our law and is accordingly affirmed.

AFFIRMED.