GUS FLOOD, Appellant, v. CITY NATIONAL BANK of Clinton, Appellee.

No. 42386.

MARCH 13, 1934.

REHEARING DENIED OCTOBER 25, 1934.

John E. Purcell, and Davis, McLaughlin & Hise, for appellant.

Ernest L. Miller and Havner, Flick & Powers, for appellee.

KINTZINGER, J.—About 8 o'clock a. m. on March 15, 1932, the officers of the City National Bank of Clinton, Iowa, were held up by robbers, and the bank robbed of $100,500. After binding the officers, the robbers placed the money in the sack and left in an automobile. They stopped on the road alongside of a farm near Camanche, Iowa. At that place there was a 25- or 30-foot embankment immediately south of the highway, on which there was a rubbish heap about 20 or 25 feet long, consisting of cans, wash boilers, automobile fenders, brush, and debris. At that place they changed clothes and threw those they had been wearing and two or three guns over the embankment. They then hid the sack under a boiler cover in the pile of junk or debris and drove away on the road toward Davenport.

The money was taken from the bank by threatening the bank officers and employees with guns and by threatening them bodily harm. The bank's money was taken from the bank and its officers without any voluntary act or consent on their part. None of the bank officers or employees saw the money or knew anything about its whereabouts from the time it was taken until it was returned.

Plaintiff's brother, Mr. Arvid Flood, and a hired hand, who lived on the adjoining farm were attracted by the automobile driving along the road at a terrific speed. They heard the brakes applied, and saw the car stop suddenly alongside of the junk pile where they saw the men change clothes. After the car left, Arvid Flood, his hired hand, and a neighbor went to the place where the car had stopped, where they found the clothing and two or three revolvers. Mr. Flood, thinking something was wrong, telephoned the police at Clinton. About a half hour later the officers arrived, and told them of a bank robbery. Flood gave them the clothing and guns, and the officers then started off to look for the robbers.

A short time thereafter the plaintiff, a brother of Mr. Arvid Flood, came to his farm with a man named Petersen who was looking for a job. Flood told his brother and Petersen about the four men in a car stopping at the pile of debris and what they had found there. The plaintiff then said that he was going over to see what he could find. He went over and in a short time returned carrying a sack or pillow slip which contained the money, which they later learned was taken from the defendant bank. They took the sack into the house and sent the young man to a neighbor's house to telephone the police. The police came within a half hour, and they all drove to the City National Bank of Clinton and delivered the money to an officer of the bank, who identified it as belonging to the bank. The plaintiff testified that, when he found it, he did not know whose money it was. He found it in the rubbish pile under the cover of a wash boiler in an ordinary pillow slip. Plaintiff did not know that any money was hidden in the junk pile when he went there, and did not know that it belonged to the bank until after taking it to the bank and identified about 11:30 a. m. the same day.

Plaintiff's motion for a directed verdict was based on the ground that the money stolen from the bank was taken from the officials involuntarily and after it was so taken constituted "lost" money; that the plaintiff found the money, and under section 12211 of the Code was entitled to a reward of ten per cent.

The defendant's motion for a directed verdict was based substantially upon the grounds: (1) That the stolen money was not "lost" money; and (2) that the statute providing for a reward is void as being contrary to and in violation of section 9, article I, of the State Constitution, providing that "No person shall be deprived of * * * property, without due process of law."

I. The first question for determination is whether or not property stolen from the bank was "lost" property. It is contended by plaintiff that, because the money was taken from the bank and its officials involuntarily, and because none of the bank's officials knew of the whereabouts of the money until after it was returned, it was, during that period, entirely lost, and, because it was found by the plaintiff, he was entitled to the statutory reward.

It is first contended by defendant that the finder of the money is not entitled to a reward because he knew who the owner

was. This was undoubtedly the effect of the early statutes on this subject. Section 1514 of the Code of 1873 provided:

"If any person shall find any lost goods, money, bank notes, or other things, * * * of the value of five dollars and upwards, such person shall inform the owner thereof, if known, and make restitution of the same *without any compensation whatever*, except the same be voluntarily given." (Italics ours.)

Section 1518 of the Code of 1873 provides that "As a reward for the * * * finding of lost goods, money, bank notes, and other things, * * * the finder shall be entitled to ten per cent upon the value thereof. * * * "

These sections were somewhat inconsistent and were later changed. The provisions on this subject in the Code of 1924, 1927, and 1931 omit the wording, "without any compensation whatever, except the same be voluntarily given" appearing in the prior statutes. There is no inconsistency between sections 12204 and 12211 of the present Code, and under them a reward is properly allowed. Section 12204 provides that the finder shall inform the owner of the property, *if known*, and make restitution thereof. This section is not inconsistent with section 12211. Both are in the same chapter, and 12211 provides that "Before restitution of the property or proceeds thereof shall be made, the finder shall be entitled to ten per cent upon the value thereof." Both of these sections when read together are plain, unambiguous, and harmonize with each other. The effect of their provisions is that restitution be made, but that the finder before making restitution is entitled to ten per cent of the value.

It is also claimed that there is a conflict between sections 12211 and 13018 because section 13018 provides that "If any person come by finding to the possession of any personal property of which he knows the owner, and *unlawfully* appropriate the same or any part thereof to his own use, he is guilty of larceny." We see no conflict in these two sections. The allowance of a reward as a compensation for the finding is made lawful by section 12211, and the payment or retention of such reward would therefore not constitute an "unlawful" appropriation thereof.

It is claimed that, because the defendant had knowledge of the owner of said property, the statute providing a reward does not

apply. For the reasons hereinabove already given, we believe it immaterial whether the finder of lost goods does or does not know to whom the property belongs. Such a construction of the statutes would, in most cases, render the statute meaningless, as well as to deprive the owner of the property of the benefit of a public search therefor.

II. The serious question in this case is whether or not stolen money under the conditions shown in this case can be considered "lost". Can the word "lost" in the statute be construed to include "stolen property"? Section 12211 provides:

"As a reward for the taking up of boats and other vessels, and for finding lost goods, money, bank notes, and other things, before restitution of the property or proceeds thereof shall be made, the finder shall be entitled to ten per cent of the value thereof."

Section 63, par. 2, of the Code, provides:

"Words and phrases shall be construed according to the context and the approved usage of the language; but technical words and phrases, and such others as may have acquired a peculiar and appropriate meaning in law, shall be construed according to such meaning."

The general rule is also that, where a word of common use has a plain and well-recognized meaning, the courts will, as a general rule, give it such a meaning. Equitable Life Ins. Co. v. Gleason, 56 Iowa 47, 8 N. W. 790; Blackman v. Wadsworth, 65 Iowa 80, 21 N. W. 190.

Guided by these rules of construction, we may look to the lexicographers for a definition of the word "lost". Webster's dictionary says it means: "Parted with"; "gone out of one's possession"; "taken from the possession of or denied to the efforts of." Funk and Wagnall's dictionary says it means: "Not to be found or recovered"; "parted with"; *"taken away to some place unknown to the owner or former possessor"*; or "left as by accident, in a forgotten place."

The evidence shows that the possession of the money in question was "parted with" by the owner *involuntarily*. It also appears that said money was *"taken away to some place unknown to the owner"*. It further appears from the evidence that the money had "gone out of the owner's possession" and that it was "taken from

the possession of or denied to the efforts of" the owner. The money had been taken from the bank early in the morning and was not returned until almost noon of the same day. During all that time the bank had no knowledge of the whereabouts of the money and had no control over it. When the money was found by the plaintiff, the bank was entirely ignorant of its whereabouts. Under these facts, was this money lost?

While we have no exact precedents bearing on this question in this state and while there are few or no exact precedents in other states, it has, however, been held in some states that stolen property, the possession of which has been *involuntarily* taken from the owner without his consent, is considered lost property. First National Bank v. Brown, 117 Kan. 339, 230 P. 1038, 39 A. L. R. 1242; Automobile Insurance Company v. Kirby (Ala. App.) 144 So. 123; Murray v. Ready, 85 Colo. 544, 277 P. 298; Deaderick v. Oulds, 86 Tenn. 14, 5 S. W. 487, 6 Am. St. Rep. 812; St. Martin State Bank v. Steffes, 88 Mont. 85, 290 P. 259; Lehman Mfg. Co. v. Jewett, 90 Ind. App. 12, 168 N. E. 46.

In Automobile Ins. Co. v. Kirby (Ala. App.) 144 So. 123, the court said:

"Under the facts in this case there can be no doubt that the possession of the property was parted with involuntarily, so that the mind had no impress of, and could have no recourse to, the event. It follows that when property is stolen and is afterwards abandoned by the thief at a place unknown to the owner, such property is lost within the meaning of our statute."

In First National Bank v. Brown, 117 Kan. 339, 230 P. 1038, 39 A. L. R. 1242, the court held that stolen bonds might be considered as "lost". In that case the statute provided:

"That whenever any bond or warrant of the state, * * * county, city, * * * shall become so far mutilated as to become unfit for circulation, *or shall be lost or destroyed,* a duplicate thereof may be issued by the officer authorized by law to issue such bonds or warrants." (Italics ours.)

In that case the court said:

"The defendant city argues that the statute does not apply to *stolen* bonds, but only to those which have been mutilated, lost, or

destroyed. There is no merit in this; *a bond stolen from the lawful owner,* and for which he has made diligent \* \* \* search, *is lost to him.* The authorities discussing the rights .of the parties treat loss and theft from the rightful owner as the same. \* \* \* In Force v. Elizabeth, 27 N. J. Eq. 408, it is held: 'Equity, in relieving against the loss of a bond payable to bearer, makes no discrimination against loss by theft.' " (Italics ours.)

8 C. J. 796. Where the circumstances are such, considering the place and conditions under which the property is found, as to lead to the inference that the property was casually or involuntarily left there, it may be considered as lost property.

There are a number of cases holding that property is not lost where it is voluntarily left in a certain place *by the owner,* but where its whereabouts is accidentally overlooked or forgotten. In such cases the property is not considered "lost". Lawrence v. State, 1 Humph. (Tenn.) 228, 34 Am. Dec. 644; Hamaker v. Blanchard, 90 Pa. 377, 35 Am. Rep. 664; Sovern v. Yoran, 16 Or. 269, 20 P. 100, 8 Am. St. Rep. 293; Ferguson v. Ray, 44 Or. 557, 77 P. 600, 1 L. R. A. (N. S.) 477, 102 Am. St. Rep. 648, 1 Ann. Cas. 1; Foster v. Fidelity Safe Deposit Co., 162 Mo. App. 165, 145 S. W. 139; Hoagland v. Forest Park Highlands Amusement Co., 170 Mo. 335, 70 S. W. 878, 94 Am. St. Rep. 740.

In Lawrence v. State, 1 Humph. (Tenn.) 228, 34 Am. Dec. 644, the court says:

"To lose is not to place or put any thing carefully and voluntarily in the place you intend and then forget it, it is casually and involuntarily to part from the possession; and the thing is then usually found in a place or under circumstances to prove to the finder that the owner's will was not employed in placing it there."

In Foster v. Fidelity Safe Deposit Co., 162 Mo. App. 165, 145 S. W. 139, the court said:

"To be lost, it must have been unintentionally or involuntarily parted with. \* \* \* It has been held that in order to constitute legal losing the thing must have been actually lost by the owner, \* \* \* that is, casually and unknowingly dropped. \* \* \* It must have involuntarily and accidentally, as respects the owner, gotten out of his possession."

In practically all of the cases cited by appellee the court at-

tempts to define and construe the term "lost property". In none of them, however, do the courts hold that property stolen under the conditions disclosed by the evidence in this case would not constitute lost property.

It is also contended by appellee that because the money in question was intentionally hidden in a place known to the robbers it could not have been lost. The true rule, however, from an interpretation of all the cases, is that, in order to justify a holding that the property was not lost, it would have to be hidden or voluntarily left somewhere by the owner. The distinction between these cases and the case at bar is that it was not voluntarily hidden or misplaced by the owner. In the case at bar the owner knew absolutely nothing about the place where it was hidden. It was taken away from the owner *involuntarily and hidden in the place where it was found* without his knowledge or consent and against his will. This is not a case where the property was lost because of bad investments, or because it was squandered or given away, or because of gambling, waste, or bad loans. In all of such cases the money is voluntarily and intentionally parted with by the owner, and, though it might be said it was lost, the fact remains that, after it was gone, through the voluntary acts of the owner, it was no longer his property. He not only voluntarily parted with its possession, but its ownership as well. Money lost by theft is still the property of the owner. In the case at bar the money was parted with not only involuntarily, but taken away from the bank officers by duress, by fear, force, and threats. It cannot be said that simply because the officers of the bank opened the vaults of the bank through fear, force, and threats their acts became voluntary. In such a case the acts were involuntary and procured through duress. Money or property taken from the bank under such circumstances might be as effectually lost as though it was accidentally dropped in the sea. Without pursuing the subject further it is our conclusion that money lost by theft, and parted with by a bank in the manner in which the money in question was taken from the officers of the bank to a place unknown to the owners, is lost property under the provisions of section 12211 of the Code.

III. It is also claimed by appellee that section 12211 is unconstitutional and contrary to article I, section 9, of the Constitution, as depriving the bank of its property without due process of law. The statute in question provides a compensation for the finding

of lost goods and money. It is the general rule of law "that the unconstitutionality of a statute must plainly, clearly and palpably appear. Even if the constitutionality of a legislative act is doubtful, the courts will resolve the benefit of the doubt in favor of the legislature's power." As said in City of Des Moines v. Manhattan Oil Co., 193 Iowa 1096, loc. cit. 1117, 184 N. W. 823, 188 N. W. 921, 23 A. L. R. 1322:

"There is no presumption against the validity of an act of the legislature. On the contrary, all presumptions are in its favor, and a statute will not be held unconstitutional unless its contravention of constitutional guaranties is so clear, plain, and palpable as to leave no reasonable doubt on the subject; and where the language is reasonably susceptible of different meanings, the courts will lean to that construction which is consistent with its validity. State v. Hutchinson Ice Cream Co., 168 Iowa 1, 147 N. W. 195, L. R. A. 1917B, 198; Barr v. Cardell, 173 Iowa 18, 155 N. W. 312; McGuire v. C., B. & Q. R. R., 131 Iowa 340, 108 N. W. 902, 33 L. R. A. (N. S.) 706; State v. U. S. Exp. Co., 164 Iowa 112, 145 N. W. 451; Brady v. Mattern, 125 Iowa 158, 100 N. W. 358, 106 Am. St. Rep. 291; Rodemacher v. M. & St. P. Ry. Co., 41 Iowa 297, 20 Am. Rep. 592."

This rule is also adopted by the United States Supreme Court. See Arkansas Nat. Gas Co. v. Arkansas Railroad Commission, 261 U. S. 383, 43 S. Ct. 387, 67 L. Ed. 705.

While the constitutionality of section 12211 has not been directly construed by this court, analogous statutory provisions have been. Ahern v. Dubuque Lead & Level Mining Co., 48 Iowa 140. In that case section 1229 of the Code of 1873 was under consideration by this court. That statute provided:

"Any person, or corporation, who, by machinery, such as engines or pumps, or by making drains or adit levels, or in any other way, shall rid any lead bearing mineral lands or lead mines of water, thereby enabling the miners and the owners of mineral interest in said lands to make them productive and available for mining purposes, shall be entitled to receive one-tenth of all the lead mineral taken from said lands as compensation for said drainage."

In that case we said:

"The only question in the case involves the validity of section 1229, above quoted. We will briefly proceed to consider its pro-visions with a view to determine its constitutionality. It authorizes the owner of an adit level to recover a compensation for the benefit his outlay of money and exercise of skill have bestowed upon owners of mines. The work resulted in freeing the mines of water, which had rendered them valueless. It was intended for his own benefit, but so intimate were the relations between his property, whereon the work was done, and the property of the person benefited, that it could not be constructed for his own purposes without conferring benefit upon the other. The mine owner avails himself of the skill and work of the owner of the adit, and raises mineral. Ex æquo et bono, he ought to render compensation to the owner, whose outlays have enriched him. The common law will not give to the owner of the adit a remedy. The statute in question does. We are utterly un-able to discover any particular where it is in conflict with the consti-tution. It is identical in principal with the statute regulating party walls and partition fences, and is not unlike the statutes relating to the drainage of swamp and coal lands, and the change of water courses. The statutes applicable to lost goods and rafts, and vessels adrift, involve the same principles. * * * Is such a work for such an object lawful? We cannot doubt that it is, for this reason: It bestows benefits upon owners of mines, by enabling them to obtain valuable metals that were before inaccessible; it restores, as it were, to them their property. In this view the adit owner acts the part of the finder of lost property, or of one who takes a vessel adrift. *Surely the statute which enforces compensation from the owner that has been benefited cannot be unconstitutional. It is identical in principle with the statute relating to lost goods and watercraft.* (Italics ours.) If there was no statute on the subject, it cannot be doubted that one, by means of an adit, might lawfully drain all the mines in his neighborhood. The owners, *ex bono et aequo,* ought to compensate him. But, in the absence of a statute, he cannot recover compensation. The section of the Code cited is intended to compel the mine owners to do that which, in good conscience, they ought to do." As seen by the foregoing quotation we said, among other things: "The statutes applicable to *lost goods and rafts, and vessels adrift, involve the same principles. * * * It is identical in principle with the statute relating to lost goods and watercraft.*" (Italics ours.) In the foregoing case we said further: "The common law will not

give to the owner of the adit a remedy. The statute in question does. We are utterly unable to discover any particular where it is in conflict with the constitution. \* \* \* Surely the statute which enforces compensation from the owner that has been benefited cannot be unconstitutional. *It is identical in principle with the statute. relating to lost goods and watercraft."* (Italics ours.)

We think the reasoning used by this court in the foregoing case is applicable to the case at bar. Section 12211 in effect declares it to be the public policy of this state for the good and welfare of its people to provide a reward to the finder of lost goods. This is not depriving a person of his property without due process of law, but is in effect simply awarding a compensation for the service of finding such lost goods. The owner has been benefited by the plaintiff's act in finding the money. We find nothing unconstitutional in the section involved.

For the reasons hereinabove set out, we believe the lower court erred in sustaining defendant's motion for a directed verdict and in refusing to sustain plaintiff's motion for a directed verdict.

For the reasons hereinabove set out, the judgment of the lower court is hereby reversed.

ANDERSON, MITCHELL, STEVENS. and DONEGAN, JJ., concur.

CLAUSSEN, C. J., took no part.