Frost P. Patterson et al., appellants, v. Iowa Bonus Board et al., appellees.

No. 48709.

(Reported in 71 N.W.2d 1)

1088

JUNE 7, 1955.

Gibson, Stewart & Garrett, of Des Moines, for appellants.

Dayton Countryman, Attorney General, and Clarence A. Kading, First Assistant Attorney General, of Des Moines, for appellees.

SMITH, J.—In 1921 the Thirty-ninth General Assembly enacted chapter 332, known as the Soldiers Bonus Law, for the benefit of veterans of "World War I." Pursuant to its provisions, and in compliance with section 5 of Article VII of the Constitution of Iowa, the Act was submitted to, and approved by, vote of the people at the general election in November 1922.

The Act (*section 1*) provided for a state bond issue of $22,000,000, the proceeds of which were *"to be expended for the payment of a bonus to the persons defined in section four * * * or for the benefit of such persons, as prescribed by section eight."* (Emphasis supplied.)

*Section 4* designated all Iowa veterans who served in World War I "at any time between April 6, 1917, and November 11, 1918"—with certain exclusions and limitations not material here. Each was to receive "as a bonus, the sum of fifty cents for each day that such person was in active service, such bonus not to exceed a total sum of three hundred and fifty dollars."

*Section 8* provided: "Disability fund. After the payment of all approved claims and expenses of administration * * * all funds remaining * * * after December 31, 1924, not in excess of two million dollars, *shall constitute an additional bonus to be*

*administered by the bonus board for the amelioration of the condition of residents of this state within the classes as defined in section four of this act, who are suffering from disability.* All funds remaining * * * after December 31, 1924, in excess of the two million dollars *disability fund,* shall be applied to the payment of the debt herein created." (Emphasis supplied.)

Under *section 11* of the Act a "direct annual tax" was levied to provide for payment of the bonds and interest thereon "sufficient to produce the sum of" $1,100,000 "each year for twenty years."

On January 1, 1928, the Bonus Board transferred from the bonus fund to the "disability fund", as provided by section 8 of the Act, the sum of $1,821,023.68.

From March 15 of that year (1928) to March 15, 1954, disability cash payments under section 8 of the Act were paid in the sum of $1,720,454.83. The fund, as of the latter date, nevertheless amounted to $2,355,000, and was invested in United States Bonds and Treasury Bills.

The Fifty-fifth General Assembly (1953) enacted the bill in question here, House File 365 (chapter 256, Acts of the 55th G. A.) "amending" *section 8* of the Soldiers Bonus Law already described, and directing the Bonus Board and State comptroller to transfer $2,000,000 "from the bonus and disability fund, established under the terms of section 8" to the Board of Control of State Institutions "for the construction and equipment of a nursing home at the Iowa Soldiers Home at Marshalltown, Iowa, which nursing home and the use thereof *shall constitute an additional bonus for the amelioration of the condition of residents of this state, as defined in section 4 of said chapter, who are suffering from disability.*" (Emphasis supplied.)

The latter Act would have become effective July 4, 1953, but for a temporary injunction entered herein June 30, 1953.

This suit is brought by plaintiffs, who all qualify under section 4 of the Soldiers Bonus Law (and at least one who has been paid disability bonus under section 8), "on their own behalf and on behalf of the classes of persons whom they represent." They seek to enjoin defendant officials from transferring funds as directed by said chapter 256, Acts of the Fifty-fifth General As-

sembly (House File 365) asserting said legislation is unconstitutional and void, and in violation of Article VII and other provisions of the Constitution of Iowa. They appeal from the trial court's decree denying their petition. The facts are all stipulated.

I. We recognize of course the well-settled proposition that courts will declare an Act of the legislature unconstitutional *only* if it is shown to be so beyond a reasonable doubt. As said in City of Des Moines v. Manhattan Oil Co., 193 Iowa 1096, 1117, 184 N.W. 823, 832, 188 N.W. 921, 23 A. L. R. 1322: "All presumptions are in its favor,. and a statute will not be held unconstitutional unless its contravention of constitutional guaranties is so clear, plain and palpable as to leave no reasonable doubt on the subject; and where the language is reasonably susceptible of different meanings, the courts will lean to that construction which is consistent with its validity." The principle is too elementary and well settled to require laboring.

In Miller v. Schuster, 227 Iowa 1005, 1020, 289 N.W. 702, 709, after conceding that appellant's contention in that case raised a doubt as to the constitutionality of the statute under attack in that case (see pages 1014, 1015) we said: "But * * * the burden upon appellant requires more than a reasonable doubt as to the validity of the statute. It is necessary that the statute be shown to be invalid beyond a reasonable doubt." See also cases compiled and cited in Knorr v. Beardsley, 240 Iowa 828, 839, 38 N.W.2d 236.

It follows as a matter of course that we must proceed with caution and can only declare unconstitutionality when such conclusion is unavoidable. Knorr v. Beardsley, supra; Cook v. Hannah, 230 Iowa 249, 297 N.W. 262. And we must construe the statute under attack so as to uphold its constitutionality if possible. Knorr v. Beardsley, supra; Cook v. Marshall County, 119 Iowa 384, 93 N.W. 372, 104 Am. St. Rep. 283.

On the other hand it is our sworn duty to protect and uphold the constitution. McGuire v. Chicago, B. & Q. R. Co., 131 Iowa 340, 348, 108 N.W. 902, 33 L. R. A., N. S., 706; Reed v. Wright, 2 (Greene) Iowa 15, 20, 21. The duty, in a proper case, to declare a statute unconstitutional cannot be declined.

If the constitution and the statute conflict the constitution must prevail. 11 Am. Jur., Constitutional Law, section 88; 16 C. J. S., Constitutional Law, sections 92, 94, note 58, page 214.

II. Article VII of the Iowa Constitution pertains to "State Debts." Section 1 prohibits the state from becoming liable as surety for the obligations of others under any circumstances. Grout v. Kendall, 195 Iowa 467, 471, 192 N.W. 529.

Other sections give qualified permission to contract indebtedness under prescribed safeguards.

We are principally concerned here with section 5: *Method of "Contracting debt—submission to the people.* Except the debts herein before specified in this article, no debt shall be hereafter contracted by, or on behalf of this State, unless such debt shall be authorized by some law *for some single work or object, to be distinctly specified therein;* * * * but no such law shall take effect until at a general election it shall have been submitted to the people, and have received a majority of all the votes cast * * *; *and all money raised by authority of such law, shall be applied only to the specific object therein stated,* or to the payment of the debt created thereby; * * *."

We have emphasized above the language involved here and have omitted parts not pertinent to this controversy.

We have to construe the constitutional provision as well as the original Bonus Law and the proposed amendment to it.

The real intention of the latter is however not in doubt. It proposed to take $2,000,000 now held in trust by the Bonus Board (under section 8 of the original Bonus Law) the interest on which is now being used for the "amelioration of the condition" of disabled veterans of World War I, and transfer it to the Board of Control of State Institutions, to be used in the building of a nursing home at the Iowa Soldiers Home at Marshalltown to replace the present main building of that institution which has been condemned and is to be demolished "within one year after the said nursing home is occupied."

It is frankly stated: "Upon construction of the new nursing home, the present nursing home and hospital would serve as the dormitory to house persons now in the main building."

It is true the proposed amendment states the new nursing home "shall constitute an additional bonus for the amelioration of the condition" of disabled World War veterans. But this neither alters nor conceals the real purpose.

The Soldiers Home at Marshalltown is a public institution, maintained by specific appropriations made each biennium by the legislature. It will be noted that under the proposed amendment this money is to be used solely for the construction and equipment of the building. If such building is to be used, appropriations for the Home must be the source thereof. Clearly one of two situations must result: If, as claimed by defendants, this building will be for the sole use of World War I veterans, then general funds are being used for a special purpose, and discrimination in the use thereof exists between the veterans of the several wars. If to be used as a general facility at the Home for all those entitled to use the Home, then Bonus funds clearly are being used for a purpose not contemplated and by parties not entitled thereto.

It is argued by the defense that a bill authorizing a "capital improvement" does not usually provide for "operational expenses or maintenance" but that "such funds ordinarily are supplied later by way of biennial appropriation."

The argument is a confession that the amendment would make section 8 of the Bonus Law ineffective without financing from other sources not provided by the Bonus Law. It reveals the fallacy of any attempt to substitute a "capital improvement" for the "additional bonus" contemplated by section 8 of the Bonus Law.

In this connection it is pertinent to note that section 6 of this same Article VIII of the Constitution forbids by implication the repeal of any such law after its approval by the people and after debt has been contracted under it; but expressly authorizes the legislature to "forbid the contracting of any further debt, or liability, under such law." We fear the amendment we are considering would offend the spirit of this provision by placing the effective continuance of the "additional bonus" at the mercy of future legislatures.

III. We have already held the World War I Bonus Law,

as originally enacted, did not offend the "single work or object" provision. Grout v. Kendall, supra (195 Iowa 467, 471). See also Knorr v. Beardsley, 240 Iowa 828, 855, 38 N.W.2d 236, 251, which involved similar language in the World War II Act.

These decisions are sound but they do not meet our difficulty here. They hold in the language of the Knorr v. Beardsley opinion that "There can be no serious controversy over the singleness of purpose and the unity of object with respect to items (1) and (2)." These items correspond to sections 4 and 8 in the World War I Bonus Law.

But these decisions involved no construction of the language of section 8 of the Bonus Law. Their holding must be held applicable to the law unmodified as attempted by the amendment we are considering since no such proposition was before the court.

IV. Section 4 of the Bonus Law clearly contemplated payment of a *cash bonus* to each member of the class on the basis of fifty cents for each day spent in active service. After this cash bonus was distributed and expenses of administration paid, what remained of the proceeds of the bond issue (not in excess of $2,000,000) was (under section 8) to "constitute *an additional bonus* to be administered by the bonus board for the amelioration of the condition of (members of the class) suffering from disability." The effect of the decision in Grout v. Kendall, supra, was to uphold this second provision (section 8) as a part of the same "single object"—the payment of an additional *bonus*.

 We cannot assume the word "bonus" had one meaning in section 4 of the Act and a different meaning in section 8. The word "additional" does not mean "different" nor imply the word bonus was used in a different sense. It is a sound rule of construction to assume the word was used throughout with the same meaning. "Undoubtedly, there is a natural presumption that identical words used in different parts of the same act are intended to have the same meaning." Atlantic Cleaners & Dyers v. United States, 286 U. S. 427, 433, 52 S. Ct. 607, 609, 76 L. Ed. 1204. It is noted in this decision that the presumption is not "rigid" and that the meaning may vary where the subject matter is not the same in the several places where such identical words

are used. Manifestly, however, this qualification cannot aid the defense here in face of the "single work or object" provision of the constitution, and the requirement of an approving vote of the people.

This canon of construction is thus stated in 50 Am. Jur., Statutes, section 271: "* * * it is ordinarily regarded as reasonable to assume, or presume, or conclude prima facie, that words used in one place in a legislative enactment have the same meaning in every other place in the statute * * *." There is abundant citation of authority to support it. See also text and citations in 59 C. J. 1003, note 82; 82 C. J. S. , Statutes, section 348, page 728, note 14.

 This presumption should surely be given great weight where, as here, a constitutional provision requires the Act to be limited to a *single* object "distinctly specified." The use of the term "additional bonus" to prescribe what was to be done with the $2,000,000 "disability fund" must have had a purpose. It was entirely unnecessary if the intention was merely to call it a "fund" to be administered for the designated purpose. It is our duty to assume the words used had some meaning.

Undoubtedly the "single object" was the payment of a bonus—of course for the benefit of veterans of World War I. The preamble of the Act clearly stated: "AN ACT authorizing the state of Iowa to become indebted * * * to procure funds for and pay a bonus to persons who served", etc. Then followed details not pertinent here. There was no further reference to the object or purpose of the Act.

The allocation of the bonus was to be in two categories: First, every member of the class was to be paid a cash bonus on the basis of fifty cents for each day he had been in active service (section 4) : and second, after all were so paid, the fund remaining ("not in excess of $2,000,000") was to be administered as an "additional" *bonus* on the basis of "disability." (Section 8.)

The members of the class were to receive the bonus in varying amounts depending on length of service and degree of disability, but there is no suggestion it was a different *kind* of bonus, or something in lieu thereof,

The proposed "amendment" would transform or redefine the term "additional bonus for the amelioration of" (members of the class) "suffering from disability" into a quite different thing— a mere "fund" to be used in building a nursing-home service to be rendered (if rendered at all) at one place only in the entire state.

We are not required here to determine what would have been the result had the original Bonus Law made clear that the term "additional bonus" was to be given the broad definition which is now attempted to be placed on it. It did not do so but went to the vote of the people in language which clearly, under popular usage, implied an additional cash bonus.

It is proper to point out, as do plaintiffs here, that "the category of veterans suffering from disability is varied and wide" and not all can be "ameliorated" by the service offered by a nursing home. We think section 8 of the Bonus Law (perhaps anticipating that inevitability) provided a cash bonus to enable the recipient to seek the particular "amelioration" called for by his peculiar form of disability. Only by this interpretation could it ever have been held sections 4 and 8 were for a "single object."

V. The word "bonus" is of course one of varying meaning depending on the context in which it is used. See 11 C. J. S., Bonus, page 515 et seq. Various definitions are given in Webster's New International Dictionary, Second Edition, but this seems a fair summary so far as applicable here, viz.: "1. Something given in addition to what is ordinarily received by, or strictly due to, the recipient; specif. : * * * c. Money, or an equivalent, given in addition to an agreed compensation. * * * 2. a. Money, insurance, or the like, granted by a government to its discharged soldiers." It can hardly be argued here that what is proposed is the "equivalent" of money.

We think it quite obvious the intention expressed in section 8 of the Bonus Law was to pay disabled veterans of the class defined in section 4 an additional *cash* bonus, adjustable to their varying needs on account of *disability. Our conclusion is* fortified by considerations beyond those already stated:

For one thing, the word "bonus", when applied to a

provision made by a grateful government to veterans who have served their country actively and honorably in the armed forces in time of war, certainly in common usage connotes payment in cash. "As a general rule words used in a statute are to be given their usual and commonly understood meaning, unless it is plain from the statute that a different meaning is intended." 82 C. J. S., Statutes, section 329b. State ex rel. McElhinney v. All-Iowa Agricultural Assn., 242 Iowa 860, 868, 48 N.W.2d 281; 50 Am. Jur., Statutes, section 238, citing Flood v. City National Bank, 218 Iowa 898, 902, 253 N.W. 509, 95 A. L. R. 1168, Rohlf v. Kasemeier, 140 Iowa 182, 118 N.W. 276, 23 L. R. A., N.S., 1284, 132 Am. St. Rep. 261, 17 Ann. Cas. 750, and many cases from other jurisdictions.

We doubt if any person who voted in the election in 1922 when the Bonus Law was submitted to the people, whether he voted for or against it, had anything but a cash bonus in his mind. We may take judicial notice of the popular conception of the term "soldiers bonus" as ordinarily meaning something payable in cash. "Invalidity may be shown by things which will be judicially noticed * * * or by facts established by evidence." Weaver v. Palmer Bros. Co., 270 U. S. 402, 410, 46 S. Ct. 320, 321, 70 L. Ed. 654.

And certainly the construction placed on the Act by the officers upon whom devolved the administration of the Bonus Law reveals no other thought except payment in cash. We have said repeatedly and unfalteringly that great weight should be given to the construction of a statute by such officials.

Possibly our latest pronouncement to that effect is found in State ex rel. McElhinney v. All-Iowa Agricultural Assn. (supra) : "A well-recognized rule is that, while not controlling, courts give much weight to the construction of statutes by administrative officials charged with their operation and enforcement. Especially where such construction is of long standing it will not be lightly discarded by the courts." (242 Iowa at page 868.)

Section 8 of the Bonus Law has since 1928 been considered and administered by the Bonus Board and other officials as meaning a cash bonus for disabled veterans of World War I, the

amount in each case based upon careful inquiry into the individual's needs. The evidence of the adoption of that construction is unmistakable.

Payments under it were begun March 15, 1928. During the subsequent twenty-six-year period (to March 15, 1954) they have aggregated $1,720,454.83. In the year this suit was commenced (1953) 654 persons were paid $261,069.44 by the issuance of 5464 warrants. Four hundred ninety-one of them have been rated "total permanently disabled." Twenty were receiving care cost of $129 per month because they were totally helpless.

The Bonus Board has utilized the facilities of the Soldiers Relief Commission of each county in the state in determining the qualifications and condition of applicants and the cost of service appropriate to their needs.

The construction thus placed on section 8 of the Bonus Law by those charged with its administration is an impressive consideration confirming our analysis of the language of the Act itself. Even the legislature seems to have deemed an amendment was necessary to change it. Certainly no one would argue the Bonus Board could have diverted the fund as is proposed here.

VI. While we are not concerned with the wisdom of the proposed legislation, it is proper, as bearing on the question of reasonable construction, to consider the inadequacy and impropriety of its provisions for performing the functions of an "additional bonus" as the term appeared in the Bonus Law. It would invest the $2,000,000 in building and equipping a 200-bed nursing home with no provision for cost of operation and maintenance except the income from the relatively small remaining fund or the expenditure of the fund itself. The figures already quoted for the year 1953 eloquently speak the inadequacy and impropriety of the proposed plan. Over 600 were paid additional bonus that one year. Nearly 500 were classified as totally disabled. Twenty were totally helpless.

The use of $2,000,000 for a 200-bed nursing home to meet such a situation (doubtless state-wide) would seem, on its face, perilously close to an improper diversion of trust funds, entirely aside from constitutional considerations. What about the needs

of those totally disabled members who manifestly could receive no adequate service? How about the partially disabled? And how about the cost of operation which would have to be borne by other funds, not provided under and by the Bonus Law, under, and in conformity with, constitutional limitations and provisions?

We are abundantly convinced the $2,000,000 originally set aside under section 8 of the Bonus Law was intended to furnish an "additional" bonus of the same character as that provided by section 4, a cash bonus, but allotted according to the varying nature and degree of disabilities of the recipients. Only in that way could it be administered fairly and equitably *as a bonus.*

VII. Defendants find an analogy between the "single work or object" provision involved here and the provisions of section 26, Article III, of the 1846 Constitution, which says: "Every law shall embrace but one object, which shall be expressed in the title." (It is significant the present Constitutional Article III, section 29, has substituted the word "subject" for "object" in the corresponding section.)

Conceding some apparent logic in the analogy, the language defendants themselves quote from the old opinion in State ex rel. Weir v. County Judge, 2 (Clarke) Iowa 280, 282, is a sufficient answer to their contention: "The intent" (of said section 26, Article III of the 1846 Constitution) "was to prevent the union, in the same act, of incongruous matter, and of objects having no connection, no relation."

And again they quote from Santo v. State, 2 (Clarke) Iowa 165, 210, 63 Am. Dec. 487: "The object may be a *broader or narrower* one, but if it be a bona fide object for legislative attainment, and the several steps embraced in it are fairly conducive to that end or object, it is still a unit." (Emphasis supplied.)

These decisions obviously treat the word "object" as meaning "subject" which may account for the change in words when the Constitution of 1857 was drawn.

The flaw in defendants' argument at this point is their failure to recognize the narrowness of the stated object of this Bonus Law. It does not state the broad objective of furnishing "amelioration of the condition" of the disabled class, and section

1100

8 which mentions it narrows the object by specifying "an additional bonus" for that purpose. That was the single object "specified" in the Act, not the "amelioration" of disability. Certainly the distribution under section 4 was not for amelioration of disability.

■■■ The proposed "amendment" not merely oversteps the reasonable bounds of a "bonus", but as a practical matter it renders impossible a continued "amelioration" by payment of bonus, the very object "distinctly specified" in the original Act.

VIII. We make no pronouncement upon plaintiffs' argument that they have a "vested interest in and right to the disability bonus." Every word we have written assumes their right to insist that the fund be preserved sacred to the purpose of its creation by law enacted and approved under constitutional limitations and safeguards.

They are either actual or potential beneficiaries of the trust. They belong to the class designated.

Nor need we discuss other constitutional safeguards which it is argued are violated by the so-called "offending" Act. What we have said requires a reversal of the decision of the trial court, rendering unnecessary any consideration of possible conflict with other constitutional provisions, or the sufficiency of the wording of the proposed legislation to constitute an "amendment."

We are not to be understood as declaring illegal the purpose of providing a nursing home for disabled veterans. Neither the legality nor the wisdom of such a project is involved. The legality of the original Act was based on the fact it provided a bonus payable in cash whether its amount in individual cases was measured by the recipient's length of service or by that measure plus needs created by his disability. Whether the legislature could have defined the words "additional bonus" (in the Act itself) as is now attempted or could have omitted them entirely from section 8 is not before us.

It is not a light nor a pleasant matter to pass judgment on the Acts of the co-ordinate branches of our Government. But the same constitution we all revere and have sworn to uphold—the

charter under which we all function—places that duty upon the court.

We are abidingly convinced—beyond a reasonable doubt—that the Act in question here does not conform to the very constitutional provision under which the Bonus Law was enacted. The decision of the trial court must therefore be and is reversed.—Reversed.

WENNERSTRUM, C. J., and OLIVER, SMITH, MULRONEY, HAYS, and LARSON, JJ., concur.

MULRONEY, HAYS and OLIVER, JJ., specially concur.

THOMPSON, BLISS and GARFIELD, JJ., dissent.

MULRONEY, HAYS and OLIVER, JJ. (specially concurring)—We concur fully in the majority opinion but would say also:

The people of Iowa voted a bonus for veterans of World War I, exclusively.

Chapter 256, Acts of the Fifty-fifth General Assembly takes from the bonus board $2,000,000 of this money, places it in the hands of the state board of control "for the construction and equipment of a nursing home at the Iowa Soldiers Home at Marshalltown, Iowa, which nursing home and the use thereof shall constitute an additional bonus for the amelioration of the condition of residents of this state, as defined in section four (4) of said chapter [Ch. 332, Acts 39th G.A.], who are suffering from disability." Section 1.

The Act further provides: "Before any of said sum shall be expended it shall be determined by the state board of control, with the approval of the legislative budget and financial control committee, that the expenditure shall be for the best interests of the state." Section 2.

At no place in the Act does it appear that the building at Marshalltown is to be erected for the exclusive use of the veterans of World War I. In fact it states the governing factor is "the best interests of the state." The statement in the dissent that the statute "says the new structure is intended *solely* for the use of" World War I veterans is erroneous. (Italics supplied.)

It is clear the effect of the Act would be to divert this fund from the object and purpose provided in chapter 332, Acts of the Thirty-ninth General Assembly, to one of general benefits to veterans of all wars, as provided by section 219.1, Code of Iowa, 1950.

THOMPSON, J. (dissenting)—It would be impossible to disagree with the major principles of law announced by the majority. It is too well established to admit of argument that every intendment must be resolved in favor of the constitutionality of all legislative enactments, and that they may be stricken down only if their invalidity appears beyond any reasonable doubt. But, having stated these principles, the majority opinion proceeds to ignore them. I must respectfully dissent.

I. The vital point at which the majority falls into error is in its conclusion that the "single object" required by the constitution must be the cash bonus contemplated by section 4 of chapter 332, Acts of the Thirty-ninth General Assembly. Since by section 4 the method of payment of what may be designated as the "bonus in chief" is to be in cash, it is reasoned the "additional bonus to be administered by the bonus board *for the amelioration* of the condition" of veterans who are suffering from disability provided by section 8 must likewise be paid only in cash. (Emphasis added.) This must be so, it is said, or the act would transgress the "single object" provision of the constitution.

With this I am unable to agree. Section 1 of the Act provides for a state bond issue, the proceeds of which are "to be *expended* for the payment of a bonus * * * *or for the benefit* of such persons, as prescribed by section eight (8) of this act * * *." (Emphasis added.) This defines the purpose of the Act so far as it concerns us here: that is, the issuance and sale of bonds the proceeds from which shall be expended for the payment of an additional bonus for the benefit of veterans suffering from disability. A "bonus" is defined by the New Century Dictionary as "something given or paid over and above what is due; a premium; also an extra dividend * * *." Accepting this definition, there is no sound basis for the conclusion that the "bonus" referred to in section 8 is necessarily to be paid in cash.

In Knorr v. Beardsley, 240 Iowa 828, 38 N.W.2d 236, we had before us for consideration the provisions of the World War II Bonus Act. Items 1 and 2 referred to in the opinion were in substance identical with sections 4 and 8 of the World War I Act now under consideration. Indeed, the second bonus Act seems to have been drawn with the first as a model. We there determined the "single object" of the Act in these terms: "There can be no serious controversy over the singleness of purpose and the *unity of object* with respect to items (1) and (2). Clearly, they were both solely for the benefit of those who served in World War II. Such was the decision of this very question in Grout v. Kendall, supra, 195 Iowa 467, 192 N.W. 529 * * *." (Emphasis added.) Knorr v. Beardsley, supra, at page 855 of 240 Iowa, page 251 of 38 N.W.2d. Again, we said: "The movement prompting the bonus statute and the authorization of the $85,000,000 and *the sole object* of the legislature and the voters was to compensate the service men and women for their services and disability." (Emphasis supplied.) Knorr v. Beardsley, supra, at page 856 of 240 Iowa, page 251 of 38 N.W.2d.

This holding should dispose of the majority contention that the "sole object" of the World War I Bonus Act was to pay a cash bonus. In addition, significant language is found in section 1 of the Act. It is there provided that the proceeds of the bond issue shall be expended "for the payment of a bonus to the persons defined in section four (4) of this act *or for the benefit of such persons, as* prescribed by section eight (8) of this act * * *." (Emphasis added.) The "single object" of the Act, as we held in Knorr v. Beardsley, supra, was "to compensate the service men and women for their services and disability." This was to be done by the payment of a cash bonus to those described in section 4, and an "additional bonus" for the benefit of those defined by section 8. The single object of the Act was not to pay a cash bonus, as the majority holds, but to compensate and benefit the veterans.

An "additional" bonus should be interpreted as anything which comes within the meaning of "something given in addition to what is ordinarily due." The word "bonus" does not ordinarily or necessarily imply cash. Corporations often give their stockholders, in lieu of additional cash dividends, a stock bonus, or the

1104

right to purchase additional stock at a fixed price. Followers of sports are familiar with the current and controversial rule in basketball known as the "bonus" rule, which awards a second or "bonus" free throw when the first one is successful.

But the majority gives weight to what it believes to be a rule of construction that we should assume the word "bonus" is to be given the same meaning at all places where it occurs in the Act. The rule is a most tenuous one, if it exists at all. The cases in which it has been held not to apply are at least as numerous as those in which it has been followed. It appears to be one of those convenient statements which may be, and sometimes are, used to support an otherwise fragile conclusion, and may be readily distinguished or disregarded when the court so chooses. The majority opinion gives it much greater weight than seems warranted, in view of the many authorities which refine it to the point where it has little meaning. Perhaps a further study of the authorities cited by the majority may be helpful. Thus, in 50 Am. Jur., Statutes, section 271, page 260, it is said:

"There is no rule of statutory construction which precludes the courts from giving a word used in various places in a statute the meaning the legislature intended it to have in each instance. *It is not a sound proposition that the same word occurring in different places in the same statute always means the same thing;* the same word may have different meanings in different parts of the same statute, or even in the same section." (Emphasis added.)

In Atlantic Cleaners & Dyers v. United States, 286 U. S. 427; 433, 52 S. Ct. 607, 609, 76 L. Ed. 1204, also cited and relied upon by the majority, the actual holding was that the words did not have the same meaning in the different sections of the Act. The court said: "It is not unusual for the same word to be used with different meanings in the same act, and there is no rule of statutory construction which precludes the courts from giving to the word the meaning which the legislature intended it should have in each instance."

To the same effect are Helvering v. Stockholms Enskilda Bank, 293 U. S. 84, 55 S. Ct. 50, 51, 79 L. Ed. 211, and State v. Knowles, 90 Md. 646, 45 A. 877, 878, 49 L. R. A. 695.

Indeed, the Iowa legislature itself seems to have no idea that section 8, chapter 332, Acts of the Thirty-ninth General Assembly, provided for a bonus to be paid in cash. The Forty-second General Assembly thought it necessary to provide for cash payments. It did this by enacting its chapter 4, which, after providing in section 1 for investment of the "additional bonus and disability fund" created by section 8 of chapter 332, supra, directed in section 4 that "when any award from such additional bonus and disability fund is made by said bonus board, payment shall be made in the manner provided in section seven (7), chapter three hundred thirty-two (332), acts of the thirty-ninth general assembly." Section 7 of chapter 332 provided plainly for payment of the original bonus in cash. But, if the legislature were not at least doubtful that the "additional bonus" called for by section 8 was intended to be a "cash" bonus, there would have been no need for the enactment of section 4, chapter 4, Acts of the Forty-second General Assembly. The fact that section 4, chapter 332, Acts of the Thirty-ninth General Assembly, supra, clearly required payment of the major bonus in cash, while there is no reference to cash payments in section 8, is in itself some evidence that such manner of payment was not intended. What the legislature did not say may be as significant as what it said. In United States v. Atchison, Topeka & Santa Fe Ry. Co., 220 U. S. 37, 44, 31 S. Ct. 362, 363, 55 L. Ed. 361, it is said: "The presence of such a provision in the one part and its absence in the other is an argument against reading it as implied." See also Wine v. Commonwealth, 301 Mass. 451, 17 N.E.2d 545, 548, 120 A. L. R. 889.

The majority also believes the word "bonus" must be taken in its ordinary meaning. The dictionary definitions cited by the majority do not confine the meaning to "cash", and I have pointed out instances in which it is used to mean other additional payments or rewards or gifts. Whether all voters who approved the issuance of bonds to pay the bonus thought they were authorizing only cash payments I cannot say; except that as one who voted affirmatively, at this date I have no recollection that I knew section 8 was a part of the Act. Without doubt many of those who voted for passage knew of the "bonus in chief" and as

the Act provided, that it would be paid in cash; to say now that the unconstitutionality of the Act clearly appears because they also thought the "additional bonus" meant cash appears to me to be an assumption we are not warranted in making for the purpose of finding invalidity.

II. While I think the majority opinion rests its case entirely upon the question of whether the "additional bonus" of section 8 appears beyond a reasonable doubt to have been intended to be a cash bonus, there are other matters stated as a basis for the ruling, probably to "shore up" the major holding, to which brief reference should be made. It is said that we should give much weight to the administrative interpretation of the law; and since the "additional bonus" has been paid since March 15, 1928, in cash, there is strong evidence only cash was intended by section 8. I have pointed out that the Forty-second General Assembly, in section 4 of chapter 4 of its Acts, required cash payments. The bonus board, the administrative body, did not begin payments under section 8 until March 1928, at which time section 4 of chapter 4, Acts of the Forty-second General Assembly, was in full force and effect. The administrative body was not construing the Act; it was following the direct order of the legislature. The legislature, being at least in doubt as to the meaning and method of payment of the "additional bonus" provided by section 8, in 1927, before any payments had been made under it, specified they should be in cash. The administrative body of course followed this direct order. It made no interpretation of the law. No one complained that the Forty-second General Assembly had no right to specify how the "additional bonus" should be paid at that time; it is only now, when the legislature has made a different provision, that it has been challenged. But surely the question of administrative interpretation has no place in this discussion.

III. The majority opinion stresses the thought that if the sum of not to exceed $2,000,000 provided by chapter 256, Acts of the Fifty-fifth General Assembly, is used solely for the construction and equipment of the nursing home, there will be nothing left to maintain and operate it. This, the majority thinks, is in some manner proof of the unconstitutionality of the Act. The majority says: "It is frankly stated: 'Upon construc-

tion of the new nursing home, the present nursing home and hospital would serve as the dormitory to house persons now in the main building.' " We are not told where this is "frankly stated"; certainly it is not in chapter 256, supra, the statute which we are considering, and to the provisions of which we must look to determine its validity. The majority also says: "It is true the proposed amendment states the new nursing home 'shall constitute an additional bonus for the amelioration of the condition' of disabled World War veterans. But this neither alters nor conceals the real purpose."

The quotation from chapter 256 is not accurate. The nursing home is not to be used for the amelioration of the condition of World War veterans, but of "residents of this state, as defined in section 4 (4) of said chapter [chapter 332, Acts of the 39th G. A.], who are suffering from disability." The intent of the Fifty-fifth General Assembly to substitute the nursing home to be used for veterans of World War I exclusively, for the cash disability payments before given to them, to the extent of $2,000,-000 of the fund, is clear. What the "real purpose" is that is "neither altered nor concealed" is not stated, and I do not know what ulterior design the majority conceives the legislature may have had. But the statute itself seems clear, and we should determine its constitutionality by its language without looking beyond and outside it to conjure up some hidden intent to pervert the use of the home to be built to purposes other than those expressed in the Act itself. Improper diversion of the funds or illegal use of the property can be dealt with when and if they occur.

It is further said that when the sum of $2,000,000 is used for the building and equipment there will be nothing left to maintain and operate it. This is true of any capital improvement. When land is taken under the power of eminent domain, for the construction of a highway, or for an artificial lake, or for any of the many other public purposes for which it may be requisitioned, usually the taking can be made effective for the stated purpose only if funds are later made available by way of appropriations or otherwise. Roads must be built and maintained after the land is acquired; artificial lakes must be built, improved, and maintained in many ways. Our state is dotted with fine buildings

built to house our universities, colleges, mental hospitals, prisons, children's homes, and many other institutions. All of these depend upon appropriations from the legislature for their utility. But these are matters of policy and wisdom rather than of constitutionality. With the nursing home built and equipped, it is certain that appropriations would be made available by succeeding legislatures: It is a practice universally followed. Shall we now say the Act is unconstitutional because the lawmaking body has seen fit to use the funds for a nursing home in the well-founded expectation that future legislatures will follow the unvarying practice of appropriating moneys to operate it? The real claim of the appellants and the majority at this point is that they do not think the Fifty-fifth General Assembly acted wisely in deciding that a nursing home is preferable to cash payments as a means of benefiting the veterans, of "ameliorating" their condition.

Here again the majority, saying we are not concerned with the wisdom of the legislation under attack—indeed, we have no right to meddle with the judgment of the legislature—proceeds to ignore the rule it states. It says the statute is "inadequate and improper." It points out its belief that the new nursing home, if constructed, would not care for all the veterans. For that matter the cash fund itself may well prove inadequate. But these things go to the wisdom of the enactment rather than to its constitutionality. The majority opinion does no more than to demonstrate, if it demonstrates anything; that the legislature acted unwisely in the method it chose to "ameliorate" the condition of the disabled veterans. It may be that the lawmaking body deemed it advisable to provide a nursing home with full care rather than to dole out the funds available so that few if any would get full relief. Whether it chose the best method I do not know, but I am sure, as the majority says, it is not our concern.

In this connection also, the majority opinion says that one of two situations must result: either the new building will be restricted to World War I veterans, so that general funds appropriated to maintain and operate the nursing home would be used for a special purpose and for a special class, and discrimination would result (I assume illegal discrimination is what is meant);

or, if the new nursing home is to be used for all inmates of the Home, then World War I bonus funds will be used for a purpose and for the benefit of parties not contemplated.

Since the statute under attack clearly says the new structure is intended solely for the use of those entitled to the benefits of the bonus authorized by chapter 332, Acts of the Thirty-ninth General Assembly, we need consider only the first of the claimed illegalities above set forth. But in urging the matter of discrimination in the use of funds to maintain the new building if its use is restricted as section 1 of chapter 256 of the Acts of the Fifty-fifth General Assembly provides, the majority is attempting to find support for its holding beyond any point contended for by the appellants herein. There is no suggestion in their brief that chapter 256 is illegal because any moneys appropriated to service the nursing home could not legally be used solely for the benefit of World War I veterans. Nor does it seem we should borrow trouble, even though by so doing we bolster what may appear to be a desirable conclusion. As was so aptly said in City of Des Moines v. City of West Des Moines, 239 Iowa 1, 14, 30 N.W.2d 500, 507, "There will be time enough to bid the Devil 'good morrow' when we meet him." I do not know whether, if the new nursing home should be erected and the legislature should appropriate from the general funds to operate it, such an act would be fairly open to the charge of invalidating discrimination. The point is not suggested or argued, and should not be used to point up a claim of illegality of the Act under consideration.

IV. A special concurring opinion now filed urges that chapter 256, Acts of the Fifty-fifth General Assembly, does not restrict the use of the proposed nursing home to veterans of World War I, because of the provision that none of the funds appropriated shall be expended until it shall be determined by the state board of control, with the approval of the legislative budget and financial control committee, "that the expenditure shall be for the best interests of the state." It is said "the governing factor is 'the best interests of the state.' "

Here again those of the majority who join in the special concurrence are finding unconstitutionality of the statute upon a ground not argued or so much as suggested by the appellants.

1110

It is beyond our rules and forbidden by many decisions that we reverse upon a point not raised in the trial court or argued here; it is especially wrong when by so doing we invalidate a statutory enactment of the legislature. Nor is the logic of the special concurrence evident. The nursing home to be built is specifically said to be for the amelioration of the condition of veterans of World War I, as defined by section 4 of chapter 332 of the Acts of the Thirty-ninth General Assembly; but the structure is not to be built until the board of control, with the approval of the legislative budget and financial control committee, has decided it is in the best interests of the state. That is, the building is to be built when it is determined by the board of control and the legislative committee that the best interests of the state require that it be constructed; but such construction, when made, is to be for the amelioration of the condition of the specified veterans. The Act gives the board of control and the legislative committee no power to act upon the broad general principle of whatever may be for the best interests of the state; it is only when they decide it is for the best interests of the state that the structure intended for and limited to the use and benefit of veterans of World War I should be built that they are to proceed. Whatever may be conceived to be the right of the legislature to give the power to withhold appropriations at the discretion of an interim committee is not for our consideration at this time. It is not argued by appellants and so the same rule applies which has long been in force by rule and by our numerous decisions, and which I have referred to above. We should not consider errors or propositions not argued; we should not consider claims of unconstitutionality not pleaded and urged in the trial court. These principles are so well established that they should not require supporting citation, nor should it be necessary to call attention to them. But see Rule 344(a)(4)(Third), Iowa Rules of Civil Procedure; Jacobs v. City of Chariton, 245 Iowa 1378, 65 N.W.2d 561, and State v. Walters, 244 Iowa 1253, 58 N.W.2d 4.

V. The majority also places weight upon the thought that chapter 256, supra, transgresses section 6 of Article VII of the Constitution of Iowa. This, it says, is because the Act under

consideration "would offend the spirit of this provision [section 6, Article VII] by placing the effective continuance of the 'additional bonus' at the mercy of future legislatures."

The plaintiffs' petition does not allege any violation of section 6, Article VII. We have several times held we will not consider claims of unconstitutionality not pleaded and urged in the lower court. State v. Walters, supra, 244 Iowa 1253, 1260, 1261, 58 N.W.2d 4, 8. See also Jacobs v. City of Chariton, supra, 245 Iowa 1378, 1394, 65 N.W.2d 561, 569, and cases cited.

VI. The conclusion seems to me to be inescapable that the statute under attack here is not so clearly unconstitutional beyond any reasonable doubt that we have the right to strike it down. To uphold the position of the majority, it must be clear beyond such doubt that the words "additional bonus" in section 8 of the original Act mean a "cash" bonus and only that. The authorities point definitely in the opposite direction. Considerations of efficiency, expediency, advisability or wisdom are not for us; we have no duty to say whether the legislature was well advised, whether it chose the wisest method, in determining how the disabilities of the veterans would be best ameliorated. As I read the majority opinion it finds unconstitutionality first, and chiefly, because the "additional bonus" can be only a cash bonus; and second, because the method of using the fund provided by the Fifty-fifth General Assembly, in the opinion of the majority, will not work out well, is ill advised and will not give the veterans as good protection as they will secure by cash payments under the present system. Neither of these reasons is so free from reasonable doubt that we are warranted in interfering with the law as enacted by a co-ordinate branch of Government. The judgment of the trial court should be affirmed.

BLISS and GARFIELD, JJ., join in this dissent.